## THE WESTERN TRANSPORTATION COMPANY, Appellant, v. GILBERT C. NEWHALL et al., Appellees.

### APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

The common law liability of a common carrier cannot be restricted by notice, even when such notice is brought home to the knowledge of the owner.

The express assent of the owner to such restriction, must be proved, in order to give effect to it.

The common carrier is bound to receive and carry goods offered to him for transportation, subject to all the incidents of his employment, and there can be no presumption that the owner intended to abandon any of his legal rights.

The rule is different with regard to persons who are not common carriers, and who are not bound to render the service required. Such may make their own terms, and the owner of the goods is presumed to assent to them if he deliver the goods.

A common carrier may qualify his liability, by general notice to all who may employ him, of any reasonable requisition to be observed, on their part, in regard to the manner of delivery and entry of parcels, and various other matters, but he cannot avoid his liability as insurer of the goods entrusted to him during their conveyance, by any such notice.

The onus of proving the contract, by which the common law liability of a common carrier is claimed to have been restricted, is upon the carrier.

No distinction can be made between a notice in the newspapers, or by handbills, and one printed on the back of the receipt given.

A notice printed on the back of a common carrier's receipt forms no part of the contract, and need not be noticed in the declaration.

Where goods are received by a common carrier, to be carried under the usual bill of lading, it is incumbent on him to show that the injury resulted from one of the causes excepted in it.

The responsibility of common carriers continues until the goods have reached their final destination ; after that is reached, there may be circumstances under which their responsibility as carriers would cease, and they become liable as warehousemen only.

THIS was an action of assumpsit, brought by appellees against appellants, to recover damages from them, as common carriers, for injury to goods which appellants had undertaken to transport for appellees.

The facts on which the case is founded, are very fully and clearly stated in the opinion.

GOODWIN, LARNED & GOODWIN, and HOOPER & WILLARD, for Appellant.

HOYNE, MILLER & LEWIS, for Appellees.

BREESE, J. This case depends, for the most part, upon the evidence, which is preserved, and which we have examined with care. It is a case of bailment, the defendants being declared against as common carriers, on their undertaking to carry safely certain kegs and packages of powder, from Albany to Chicago,

by water, and there deliver them to the consignee at Chicago. A bill of lading, or receipt, of the powder, was delivered by the defendants' agent, to the consignors, upon which the first point made by the defendants arises.

They contend that the qualifications and conditions, appearing on the back of the receipt, were a part of the contract, no matter on what part of the paper they were printed. Being stipulations beneficial to the defendants, and appearing on the contract, which is the foundation of the suit, they must be regarded as constituting the contract of the parties, as much so as any other part of the paper.

Very many decisions are referred to as sustaining this view, one of which, *Barnard* v. *Cushing*, 4 Metcalf, 233, is said, in the defendants' brief, to be a review of most of the cases referred to on the point. We have looked into that case, and find that it is substantially this : Where the payee of a note, at the time it was signed by the maker, and as a part of the same transaction, indorsed thereon a promise not to compel payment thereof, but to receive the amount when convenient for the maker to pay it, it was held that the indorsement must be taken as part of the instrument, and that the payee could not maintain an action upon it. This was very correctly held, and for the plain reason, that the stipulation indorsed on the note left the contract without the essential elements of a legal obligation, capable of being enforced at law. It is a mere honorary obligation, upon which no action could be maintained. It does not seem to touch this case. But the important question in this case, is raised by the second point made by the defendants, that the conditions and exceptions on the back of the bill of lading, being parts of the contract, must go to qualify and affect the liability of the defendants, and they, therefore, should have been noticed in the declaration ; and the omission to do so, constituted a fatal variance between the contract described in the declaration, and the contract proved in evidence.

The conditions and exceptions here spoken of, are contained in a certain clause printed on the back of the bill of lading, or receipt for the powder, under the head of " Conditions and Rules." It is as follows: " The companies will not hold themselves liable at all for injuries to any articles of freight during the course of transportation, occasioned by the weather, or accidental delays, or natural tendency to decay." The objection made by the defendants, to the omission of this clause from the declaration, brings up the questions, Was it a part of the contract ? Can a common carrier limit his common law liability, by a notice of this kind, even if brought home to the knowledge

of the owner, or only by a special contract with the owner of the goods ?

We believe the rule to be now well settled, that the common law liability of a common carrier cannot be so restricted, for notwithstanding the notice, the owner has a right to insist that the carrier shall receive and carry the goods, subject to all the incidents of his employment, and there can be no presumption, when they are delivered to, and received by the carrier, that the owner intended to abandon any of his legal rights, or yield to the wishes of the carrier. Where a private carrier of goods, having the absolute right to impose his own conditions, and under no legal obligation to carry, receives goods to carry, the presumption would fairly obtain, that they were delivered to him on his terms. The common carrier is bound to receive and convey the goods safely, or answer for the loss.

All the cases referred to by defendants' counsel, on this point, of which the case in Metcalf, before cited, is said to be a review, are, all of them, cases where the indorsements were referred to in the body of the contract, and the contract by its terms made subject to the indorsement, or the contract is referred to in the indorsement; and they are cases, too, of ordinary contracts, where the party in whose favor the indorsement is made, is under no legal obligation to render the service or do the act required, and has the right to impose his own terms. On a delivery of goods to such carrier, the presumption is fair, that they were delivered on his terms.

The duties of a common carrier grow out of the relation in which he stands towards the public, and he is obliged to render the service demanded of him for a reasonable reward to be paid to him, and the owner of goods employing him, is not exposed to the presumption that he waived the performance of any of them. Such waiver can be effected only by a special contract between the owner and carrier. As early as *Southcote's Case*, 4 Coke's Rep. 83, it was determined that any bailee might stipulate for an increased or diminished degree of responsibility from that which the law imposed upon his general undertaking, and it has been so held in England ever since. This court has ruled the same way, in the case of *Ill. Central R. R. Co.* v. *Morrison and Crabtree*, 19 Ill. R. 141, and so have many, if not all, the courts of this country. A notice like this, if brought home to the knowledge of the owner of the goods, at the time of the delivery of the goods or before, and no objection made to it, would have, according to the rulings of the English courts, the force of a special contract. In most of the courts of this country, it is not so regarded. It is well settled here, that a common carrier cannot, by a general notice, even

if brought home to the owner of the goods, limit, restrict, or avoid the liability imposed on him by the common law. The case of the *New Jersey Steam Navigation Co.* v. *The Merchants' Bank,* reported in 6 Howard Sup. Court U. S. 381, is, we conceive, a fair exposition of the law, as it is in this country. That was the case of the burning of the steamboat Lexington, on Long Island Sound, in January, 1840, on which the Merchants' Bank had, in charge of Harnden's Express, some twenty thousand dollars, in gold and silver, to be carried from New York to Boston. The special agreement under which this *specie* was shipped, provided that it should be conveyed at the risk of Harnden, and that the Navigation Company were not to be accountable to him or to his employers, in any event, for loss or damage. This was the agreement with Harnden and the Navigation Company, but which, the court held, did not exonerate the company from their liability to others as common carriers. The court say: "But, admitting the right of a party to restrict his liability by express stipulation, it by no means follows that he can do so by any act of his own, that is, by a general notice. The common carrier is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself, without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public, limiting his obligation, which may or may not be assented to. He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal. And we agree with the court, in the case of *Hollister* v. *Nowlan,* that, if any implication is to be indulged from the delivery of the goods under the general notice, it is as strong that the owner intended to insist upon his rights, as it is that he assented to their qualification. The burden of proof lies on the carrier, and nothing short of an express stipulation, by parol or in writing, should be permitted to discharge him from duties which the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful and conflicting evidence; but should be specific and certain, leaving no room for controversy between the parties."

A common carrier being regarded as an insurer of the goods, and accountable for any damage or loss that may happen to them in the course of the conveyance, unless arising from the act of God or the public enemy, it is not deemed salutary policy, that he shall escape this liability, by such general notices as we are considering. He may qualify his liability by a general notice to all who may employ him, of any reasonable requisition to be

observed on their part, in regard to the manner of delivery and entry of parcels, and the information to be given to him of their contents, the rates of freight, and the like ; as for example, that he will not be responsible for goods above the value of a certain sum, unless they are entered as such, and paid for accordingly. The case of *Hollister* v. *Nowlin,* referred to in 6 Howard, is cited by the counsel for appellee, and is reported in 19 Wendell, 234. In that case it was held that stage-coach proprietors were answerable as common carriers for the baggage of passengers, and cannot restrict their common law liability by a general notice, that the " baggage of passengers is at the risk of the owners." That he can only do so by express contract, as a contract cannot be implied or inferred from a general notice, though brought home to the knowledge of the owner of the property—that he may, like other insurers, demand a premium proportioned to the hazards of his employment ; and may therefore require the owner of the goods to give such information as will enable him to decide on the proper amount of compensation for his services and risk, and the degree of care necessary to the discharge of the trust. To the same effect is the case of the *Chicago and Aurora R. R. Co.* v. *Thompson,* 19 Ill. R. 589 to 592. That a mere general notice, when brought to the knowledge of the owner of the goods carried, will not have the effect to limit his common law liability, unless there is very clear proof that the owner expressly assented to that, as forming the basis of the contract, is also held by the Supreme Court of Vermont. 23 Verm. 206, Redfield, J., delivering the opinion of the court. So in New Hampshire. *Moses* v. *The Boston and Maine R. R.,* 4 Foster, 84 ; where the court say, The question is not, whether the general rule of law may be controlled and superseded by an express agreement between the owner and the common carrier of goods ; but whether, from the mere fact of public notice, the law will imply such an agreement; and they hold it will not.

So it was held by the Court of Appeals of New York, in the case of *Dorr et al* v. *The New Jersey Steam Navigation Company,* 1 Kernan, 485, that when there is no special contract as to the liability of a common carrier of goods, he is responsible for all loss or damage except that which is caused by the act of God or the public enemy, and cannot limit this liability by notice, even if it be brought to the knowledge of the owner of the goods. They may limit their liability by an express agreement with the owner. The same is the case of *Clark* v. *Faxton et al.,* 21 Wend. 155.

The onus of showing the contract by which this common law liability is claimed to have been restricted, is upon the carrier,

and is to be proved, like any óther fact, by pertinent evidence. *The Am. Transportation Co.* v. *Moore et al.*, 5 Michigan, 379.

No distinction has been attempted to be made, nor can be made, between a public notice in the newspapers or by hand-bills, or otherwise, and the notice conveyed by this receipt, it being printed on the back of it, for wherever it may be found, it is but a notice.

The case of the *Mich. Central R. R. Co.* v. *Hale et al.*, 6 Michigan, 244, cited by appellees' counsel, is more like this case before us, in all respects, than any other to which our attention has been called.

In that case, the receipt given in evidence by the owner of the goods, is in these words:

MICH. CENT. R. R. COMPANY,

*Grass Lake, Oct.* 26, 1850.

Rec'd of Hale, Smith & Co., as consignors, the articles marked and weighed as follows:

| ARTICLES. | MARKS AND NUMBERED. | WEIGHT. |
|---|---|---|
| One car of wheat in bulk, | No. 4966. | 24,206. |

To be transported on said Railroad to the depot in Detroit, and there delivered to Hale, Smith & Co., or order, upon the payment of the charges thereon, and subject to the rules and regulations established by the company, of which notice is given on the back hereof.

WILLIAM H. PEASE,

Freight Agent, M. C. R. R. Co.

On the back of this receipt is the following:

" Abstract of the rules and regulations, as per published freight tariff:

" The company will not be responsible for damages occasioned by delays from storms, accidents or other causes; for decay of perishable articles by heat or frost to such as are affected there-by, or for damages to the hidden contents of packages, or by leakage or bursting, or by reason of improper packing, when received at the depot; nor will it be responsible for any mer-chandise unless receipted for by a duly authorized agent; nor for a greater amount than $200 on any one package, except by special agreement and upon payment of extra rates; and all goods and merchandise will be at the risk of the owners thereof while in the company's warehouses, except such loss or injury as may arise from the negligence of the agents of the company. Goods consigned to irregular stations (those not in capitals in the freight tariff) will be delivered at the nearest regular station, unless the owner gives a written order to deliver them at the irregular station at his risk."

After the evidence was closed, the company asked the court to instruct the jury, that they had a right to limit their common

law liability, and if the jury shall find by the terms of the receipt given by the defendants to the plaintiffs in this case, it was stipulated between them, that all goods and merchandise would be at the risk of the owners thereof while in the defendants' warehouses, except as to such loss or injury as might arise from the negligence of the defendants' agents, such stipulation (in the receipt) will define and limit the liability of the defendants in this case.

This instruction was refused, and error assigned thereon.

The Supreme Court say : " This question involves, under the facts of this case, both the power of limitation by notice, and by special agreement ; and in this respect it is more broadly put than the facts of the case warrant, as the point thus stated, assumes the existence of an express contract, or implies it from the terms of the receipt and accompanying notice. The error assigned is, that the court refused to charge that the company had a right, by contract with the defendants in error, to limit their common law liability ; and that if the jury shall find, that by the terms of the receipt given by the company to the defendants, it was stipulated between them, etc., such stipulation would define and limit the company's liability in this case. We say, the question is more broadly stated than the case warrants, because the assumption of the request that the " terms of the receipt " (by which was intended the receipt, and notice limiting the company's liability indorsed thereon,) determine the contract, is not in accordance with the law. All the cases which give to such notice any validity, agreeing that something more than mere notice indorsed upon a receipt or otherwise brought to the consignor's knowledge, is necessary to relieve the carrier from his common law liability. His assent to this limitation is still necessary, and that is a question of fact for the jury, to be determined by evidence *aliunde*, and is not the subject of presumption from the terms of the receipt alone. And this is the correct rule respecting notices of common carriers, designed to have such effect. The carrier can no more restrict his common law liability, unless upon the free and full agreement of the party dealing with him, than he can refuse to carry when required. Such an agreement is not to be implied from the posting of notices or the simple delivery of one to the consignor, as this would be no more than limitation of his liability by *ex parte* action. Some evidence of assent to the terms of the notice is necessary, from which a contract may be implied."

This reasoning establishes, that the indorsement is not a part of the contract, and therefore need not be noticed in the declaration, and omitting so to do, cannot therefore be a variance. The plaintiffs had no beneficial interest in the exemptions and

stipulations contained in it. If the defendant had, he could have resorted to them by way of defense, and contended that they made, what was without them a general contract, a special contract by which their common law liability was restricted. That was the course in the Michigan case cited. The railroad company brought the question before the court on the instructions, and that was the proper way.

Besides, the plaintiff pleading these indorsements, would have destroyed his whole case, for one of the stipulations is, that " gunpowder will not be received on any terms."

The stipulation that the companies will not hold themselves liable at all, for injuries to any articles of freight during the course of transportation, occasioned by the weather, or accidental delays, or natural tendency to decay, is not an important one, for as common carriers, they would not be liable for such, for they come within the general exceptions of dangers of navigation and the acts of Providence. *Clark et al.* v. *Barnwell et al.*, 12 Howard, 282.

We come now to the instructions. Those given by the court on behalf of the defendant state the law quite as favorably for him as it is, in such cases.

The fourth, fifth and sixth instructions, which were refused, assume that the burden of proving negligence is on the owner of the goods. We understand the law to be, that when goods are received by a common carrier, to be carried under the usual bill of lading, it is incumbent on him to show that the injury resulted from one of the causes excepted in it. In this case, the defendants were bound to show that the injury was caused by the weather, by accidental delays, or by the natural tendency of the powder to decay, neither of which was shown. Had that been shown, then the burden of proof would have been shifted on the plaintiff to prove negligence, but not until then.

We have examined the evidence with great care upon this point, and do not find any, going to show, that the excepted causes produced the injury. The powder was received on board a canal boat, at Albany, belonging to the defendant, about the 13th of November, 1858, arriving at Buffalo in due time thereafter, and in good condition. There being an ordinance of the city of Buffalo forbidding the storage of powder in the city, except in powder magazines, and there being none there able to receive it, the defendant removed the boat without the corporate limits of the city, to Pickard's bridge, about twenty-five miles from Buffalo, where she remained during the winter. About the 19th April, 1859, the powder was loaded on to the schooner Grey Eagle, from the canal boat lying along side, near the light-house pier. No evidence is produced by the

defendant to show the condition of the boat at this time. In the fall, when the powder was put on board, she was in good order, and good men were in charge of the boat. *George H. Clark* testifies, that he is a sailor, and has been for thirteen years, and was master of the schooner Grey Eagle during the spring and summer of 1859. About the 19th of April, 1859, this schooner received on board a quantity of powder, to be carried to Chicago; it was taken from a canal boat; did not examine the boat, and cannot say whether there was any water in it, or not. There were indications that water had been in the boat; some of the kegs of powder were wet and discolored, and looked as if they had been lying in the water. Some of the kegs containing powder had their hoops loose, and on being lifted, the powder appeared as if it was packed together in a solid lump, as it would if it had been in water; a part of the kegs were discolored more or less—some discolored and damp; the mate was ordered to receipt a part of the powder as in bad condition; its appearance indicated that its bad condition had been produced by the powder having been wet, and these indications were its dampness, its being discolored, and its packed or solid-feeling condition in some of the kegs. Some of the powder was left, and not put on board the schooner—about two or three tons; this quantity was not put on board on account of its bad condition; some of the kegs left were broken, and others being very badly stained or discolored. This powder was consigned to D. Eaton & Co., Chicago, and was delivered to them about the 4th May, 1859; contracted to carry it with the agents of the Western Transportation Company, at their office in Buffalo. The powder was well stored and cared for on the schooner.

*Henry Roper,* or *Roop,* states, that he was the owner of this schooner in the spring and summer of 1859; speaks of the loading the powder from a canal boat; says nothing of the condition of the boat, nor did he see any water in it at that time; the appearance of the kegs indicated that they had been wet, either in that boat, or some other manner; some of the kegs were, apparently, in a good condition, and some were in a bad condition; cannot state what proportion, but a considerable proportion were in bad order; Captain Clark was instructed not to receipt for it in good order; the hoops were off some of the kegs, and the heads of a few were stove in, or were loose; some of the kegs were damp, and had the appearance of having been recently wet; judged from appearances that their bad condition was caused by their having been wet; Henry Sheffield, or one Morgan, engaged the schooner; thinks Sheffield was, at the time, acting for the Western Transportation Company; acted

for that company last season and this, in the capacity of freight agent; Morgan is one of the proprietors or stockholders of that company, and was, at the time, one of its managers.

*David Eaton* states, that he is in the gun and powder trade; has dealt in powder fifteen years; received the receipts in evidence, from the plaintiffs, a year ago last fall; defendants have an office in Chicago; J. W. Tuttle is their agent; they are carriers and transporters of goods; had a line of boats on the lake, and a wharf also; after receiving the bills of lading, had notice, in May, 1859, that the powder had arrived; it came here on a sailing vessel; notice came first from some one on the vessel called the Grey Eagle, and afterwards received a notice from defendants, or some one of their people; received the powder at the magazine, outside of the city limits; Tuttle declined to deliver it until the charges were paid. The charges were paid under legal advice, and he received the powder. Tuttle agreed that after he had received the freight, and ascertained the damages, he would settle it. The powder was received from the vessel, and put in the magazine about the 9th of May. At this time he received only between 1,700 and 1,800 packages. Three or four weeks afterwards, received about three hundred packages. The powder packages were counted off by Mr. Wood, his clerk, and loaded on the wagon by his brother, and received into the magazine by his brother. Afterwards, in one or two days, Tuttle and he went down to see the powder. There was no examination of it that day. A day or two after, some of defendants' people went down again, and examined such as Mr. Hammond had thrown out while he was receiving it; it was either Mr. Tuttle or some one he sent. Some days after, Wilde, agent of plaintiffs, came and examined the whole of it; it was agreed between Mr. Tuttle and Mr. Wilde, that it should all be examined by witness. He did examine it, every keg separately; it took some four days. There were 2,200 packages. He thinks there were three kegs and three half-kegs short. Some of it had been in the water, and was spoiled entirely, and some was spoiled that had not been in the water. That which was not entirely spoiled, had received damage by moisture; it had marks of having been in the water. All the packages that had been in the water showed stains and marks— one hundred and forty-six kegs showed water marks, seventy-seven half-kegs and eleven cans; each case contained four quarter kegs, of 6¼ lbs.; a case is same as one keg.

The magazine is of stone inclosed in wood.

The powder was good, and if it had been delivered in good condition, it would have been worth, in Chicago, $5 to $5.50 per keg. Some of it was blasting powder, and worth less;

the whole invoice was worth ten to eleven thousand dollars, ($10,362.50.)

He thought the whole powder was so much damaged that it would be worthless, except to re-manufacture, and was not worth, as delivered, more than $2 per keg. There were equal to 2,025 whole kegs of the invoices. The packages were good powder, well put up.

The powder would have kept well in a canal boat, if she was dry, and if she did not leak. Powder gathers and absorbs moisture rapidly, when it is exposed to the damp atmosphere. Stains on the kegs were some months old, and water was still in them. They were saturated with water.

On his cross-examination, he said, he was selected by Captain Tuttle to examine the powder. A large portion of the kegs showed dampness, but no discoloration; labels on some of them loosened, but not discolored; he examined the nail heads in the cases; they were not discolored. Powder is very susceptible to injury from dampness. It might be spoiled from packing in green kegs or boxes or cases; paste upon labels might affect it, if there was moisture enough to reach through the wood. Powder might be defectively manufactured, and cake up, as if wet. Moisture is the principal cause, and when moisture is absorbed, the powder would appear the same as if defectively manufactured. Is assignee and agent of the plaintiffs.

*Mr. Wilde* testified, that he was agent for the plaintiffs. Saw the powder in June last. Had an interview with Tuttle, who said he had no objection to Eaton examining the powder. Some of the powder was hard, and some was soft; some lumpy, and some the brilliancy of the kernel was destroyed; caused by water. He was in Buffalo in 1859; had an interview with Bryant, secretary, and Foote, president. Foote said Bryant knew all about the matter, and had tried to send the powder forward by sail, but could not send it. He said that it was a good boat, and perfectly safe, and they had good men to take care of it. That the boat was then twenty-five miles from Buffalo.

Witness said, water caused the injury, because some of the kegs were stained, and he inferred it as to the rest.

We think this evidence fails to show that the injury to the powder was caused by the weather, by accidental delay, or the natural tendency of the powder to decay. All these witnesses speak of the powder, when transferred to the schooner, as having laid in the water, and not of its having contracted moisture from the atmosphere, or from any other natural and imperceptible cause, and that the stains upon the kegs indicated the

presence of water, not moisture merely. Though Mr. Eaton states that powder might be spoiled by packing in green kegs, and that paste upon the labels might affect it, yet it is on the fact granted, that the kegs are so green as to be moist, and the labels possess moisture enough to penetrate the wood, which is no more than saying, that sufficient moisture from any cause will affect powder. He does not say this powder was affected in either of these ways, and we think no other conclusion can be reached than this, that the unnecessary exposure in an insecure canal boat near five months, exposed to all the storms and rigors of a northern winter, and to the changes of weather so frequent in that latitude, and so exposed as to leak and admit water, all which, proper care and diligence would have prevented, was the cause of the injury. We say, unnecessary exposure in a canal boat, because we think if a magazine could not be had, then some dry, safe place, an isolated barn or other such shelter, should have been obtained in which to store the powder. It was negligence on the part of the company to have left the powder so exposed for so many months, we say, in an insecure boat, because the company have furnished no evidence of its condition during the winter and spring, and the jury had a right to believe, from the water stains upon the kegs, and their condition generally, that they had been in direct contact with water which had leaked or rained into the boat. No other sensible conclusion can be reached. Mere moisture imbibed from the atmosphere, could not have produced any such effects.

The defendants then, are chargeable with negligence, and that fixes their liability. It is proved upon them by the evidence in the case, and there is no escape from it.

The injury not arising from any one or all of the excepted causes, the right of action was complete against the defendants. The undertaking of the company was to carry and deliver, and they were bound at all hazards to deliver, unless prevented by the act of God, the weather, accidental delay, or the natural decay of the property to be conveyed, or by a public enemy.

Admitting that the close of navigation was a providential cause, and the goods could not be forwarded, still the company stood to them in the relation of carriers, they being on their route to their final destination,—they were still the insurers of the goods, and cannot escape on the plea that they were then under the reduced liability of warehousemen. But if it was so reduced, negligence has been proved, and that of a grave character. The responsibility as common carriers continues until the goods have reached their final destination. When that is reached, there may be circumstances when their responsibility as carriers would cease, but never while they are in

*transit*; Edwards on Carriers, 515; and so are all the cases cited by appellant's counsel. The counsel argue that it was a necessity the powder should remain in the canal boat out of the limits of the city during the period of its detention. It was twenty-five miles from the city, and no person to look to it but a station agent of the company, who had other business to attend to. The necessity for its remaining in the boat is assumed, it is not proved, nor is the condition of the boat shown. How did the water stains get on the casks, or how did some of them become saturated with water, if the boat was in good condition? Could a damp atmosphere merely, produce the appearances and injury proved? Again, it is asked, How could it be otherwise than that powder, necessarily kept all winter in a canal boat, should be injured by the liability to dampness which such exposure unavoidably occasioned? All this is assumption. If the powder was thus exposed, whose fault was it? Again, it is said, Here was a boat which would be in the water of the canal, whose decks would be covered with the ice and snow of winter, whose seams and joints would be subjected to the contracting and expanding effects of the changes of temperature from winter to spring, and the question is asked, was it hardly within the limits of possibility that a cargo of powder, compelled to be thus exposed, should not suffer injury? We think this statement of fact, and question made on it, decides this whole controversy against the defendants. Who permitted the powder to remain in a boat thus exposed? Under what compulsion were the defendants, thus to suffer it to remain five months? It was their own act, and shows negligence of a most extraordinary character. There is no providential interference, which the company, by reasonable diligence, could not have guarded against. If to expose powder in a canal boat, with no person on board, through a long and dreary winter, and with no fittings to make it water-tight, does not constitute gross negligence, which is nearly allied to criminality, we would be at a loss to say what acts did constitute it. None of the necessary precautions, to avoid the damage, appear to have been taken which prudent men would take under such circumstances—not one. Neither green casks, paste on the labels, or a damp atmosphere, or generated moisture, could, by any possibility, have produced this injury to the extent of two or three tons of the powder. It was water, and that water entering the boat by the negligence of the defendants.

If the injury had occurred while the boat was under way—the boat being staunch and properly fitted—there might be some pretense for claiming that the powder became wet and damp from some innate quality it possessed, or from the atmos-

Western Transportation Co. *v.* Newhall et al.

phere, or changes of weather, and then it might slightly resemble the case of *Clark et al.* v. *Barnwell et al.*, 12 Howard, 280, and *Muddle* v. *Stride*, 9 Carr. & Payne, 380. But it has none of the features of either of those cases, and no redeeming qualities.

As to the instructions in detail, we do not deem it necessary to remark upon them, as we have disposed of them, substantially, in the views we have here expressed.

As to the damages, they are no greater than the proof warrants. The examination of the powder was postponed, at the instance of the agent of the company, for several days, and it was agreed by them that Mr. Eaton should make the examination and estimate the damage.

The value of the whole invoice was stated to be $10,362 50
Value in damaged state, 2,020½ kegs delivered
(4½ short) $2, - - - - - - - 4,041 00

Leaves - - - - - - - - $6,321 50

which is the amount of the verdict.

As to the pretense that the contract was not made with the company, but with its agent, and that the corporate character of the company was not proved, it is sufficient to say, that the act of the agent has never been repudiated, but was ratified by the president and secretary, and other managers of the company at Buffalo, as appears by the testimony of Wilde, who went there expressly to see them about it, and who told him they had tried to send the powder on, but could not get a sail vessel. The defendants did not deny their corporate character. It is alleged in the declaration, they are a corporation, chartered by a law of New York. They could have put this in issue by pleading *nul tiel corporation.*

As to the rejection of Tuttle's testimony, it is apparent he was the principal obligor in the delivery bond, and was interested. No motion was made to release him, and he was not a competent witness.

Placing the case upon the ground that defendants place it upon, that the injury to the powder was the result of one of the excepted cases indorsed on the bill of lading, then the plaintiffs must recover, as they have proved such facts as warranted the jury in finding negligence.

Placing it on the rigid ground of the common law liability of common carriers, which is the true ground, the loss and injury being proved, the liability of the company is at once determined. In either view the judgment is right, and must be affirmed.

*Judgment affirmed.*