## Adams Express Company v. John S. Bratton.

1. COMMON CARRIERS—*Limitations of Liability in Contract Must be Expressly Assented to.*—There must be clear proof that the shipper expressly assented to limitations upon the carrier's liability contained in its contract, or the shipper, notwithstanding notice of such intended limitation, may insist that the carrier shall transport his goods incident to the common law employment.

. 2. SAME—*Mere Delay is Insufficient to Create Liability.*—A mere delay by a common carrier is wholly insufficient to create a liability. It must be "an unreasonable delay, which is such as involves some want of ordinary care or diligence" on the part of the carrier.

3. QUESTION OF FACT—*Reasonable Time.*—What is a reasonable time for the performance of a contract of transportation by a common carrier is a question of fact for the jury.

4. BURDEN OF PROOF—*Where Carrier has the Sole Custody of Animals for Transportation.*—Where the carrier has the sole custody of animals, the burden of proof is on him to show that he has exercised ordinary care in the carriage of the freight—in other words, that he is free from negligence which, as an efficient contributing cause, brought about the damage.

Trespass on the Case, for injury to animals during transportation. Appeal from the City Court of East St. Louis; the Hon. SILAS COOK, Judge presiding. Heard in this court at the August term, 1902. Reversed and remanded. Opinion filed March 2, 1903.

On the 9th of November, 1899, appellee shipped by appellant, from East St. Louis to the city of New York, twenty-one head of high grade horses, to be exhibited at the New York horse show, to be held on the 11th of the

same month. After the exhibition the horses were to be sold on the New York market.

The animals were loaded by employes of appellee, on horse car 81, belonging to the Pennsylvania Railroad Company. The car was fitted with stalls, which were prepared by appellee's servants under direction of appellee's stable foreman. The car left East St. Louis at 2:35 in the morning of the 9th and arrived in Indianapolis on the same day, at about eight o'clock in the morning. The car was attached to a fast mail train which left East St. Louis over the Vandalia railroad. When the horses arrived at Indianapolis it was found that the drawbar of the car was out of order, although there had been an inspection of the car before the journey commenced. This fact necessitated cutting the car out from the train, which proceeded on its way to New York, arriving there on time.

The evidence is conflicting as to what was done with the car of horses after it was removed from the train. All the evidence shows that the horses were not removed from the car, although appellant's agents were ready and willing that such an act should be done had appellee's servants required it, but they declined to unload any of the horses.

Some of the evidence tends to show that the car with the horses on board was taken into a machine shop where there were furnaces and running machinery, and that such fact, together with the noise of hammering incident to the work about the shop, caused the horses to become overheated and excited. Other evidence tends to show that the work of repairing the car was done entirely outside of the shops.

The car was repaired, and the horses left Indianapolis at 2:45 in the afternoon of the same day, on a fast passenger train for New York, arriving in that city from five to twelve hours later than the fast mail train, with which the car originally started. When the horses arrived in New York a number of them were found to be sick and suffering from colds, but all of them seemed to have been admitted to the horse show in Madison Square Garden, where the exhibi-

tion was held, without question, by the authorities in charge of the exhibition. After the exhibition was over appellee sold most of the horses, but he claims he lost heavily on a number of them, and was obliged to reship others as being unsalable. Appellee employed four men who had charge of the horses in transit.

The contract for the shipment of the horses was made by appellee in person, with appellant's agent at East St. Louis. Appellee, prior to this particular shipment, had made many other shipments of "commercial horses," and at such times had always signed a written contract and had paid $275 for a car, and there would be as high as twenty-eight horses loaded on a car, he placing in charge of the animals a single attendant. For this particular shipment he paid $300, with four attendants, who were transported free by appellant. No contract was signed by appellee himself; he was requested by telegram from the express messenger in charge of the horses in Indianapolis, to authorize one De Mawby, one of the four attendants with the horses, to sign the written contract which had been prepared at East St. Louis. Appellee paid no attention to this message. De Mawby signed the contract in the name of appellee. The evidence is conflicting, whether De Mawby or one Chance was in control of the horses.

Appellee testified that Thomas, the agent of appellant at East St. Louis, never asked him to sign the contract; that De Mawby had no authority to sign it; that Chance was in charge of the horses after they left East St. Louis; that one Reeves had charge of loading them at East St. Louis; that De Mawby had nothing to do with the matter, except to help as directed; that he had a contract with the agent of appellant at East St. Louis that the horses were to be in New York on November 11th, at between three and four o'clock in the morning of that day, that being the time of the arrival of the fast mail train at that place. He further testified :

"In shipping horses, they were always shipped under the live stock contract, printed and signed; in shipping ordi-

nary horses you have to ship them under their contracts or you don't ship. I did not instruct anybody to sign this contract for me; it was to be brought to me on the train, to be signed by me, I suppose, but when we got to Indianapolis the horses were cut off and I went on; of course I was not there to sign the contract, but I had frequently signed contracts of the same kind; they had a regular form that they used. I don't know what the valuation is in this contract. I never read it over; I never bothered with it; I knew I would have to sign what was written there or stay at home; undoubtedly I would have signed it myself."

Mr. Thomas, the agent of appellant in East St. Louis, testified that he had a talk with appellee about the shipment, and that he asked appellee in what class he wanted his horses to go—commercial or race horse class—and appellee answered and said he wanted them to go in the latter class; that he asked appellee if he wanted a contract made as it always had been made, and that he replied "Yes." His evidence further is that appellee had signed many contracts of the same kind as this one, and agreed in appellant's office at East St. Louis to sign this one. He further testified that De Mawby signed the contract in appellee's name, before the horses left East St. Louis, but in this matter Thomas is evidently mistaken, as it seems to be agreed all around, that the contract was not signed until the delay occurred in Indianapolis, when another agent of appellant asked Bratton, by telegram, to authorize De Mawby to sign it.

The printed form of contract referred to in the evidence of appellee and Thomas, limited the liability of the Adams Express Company to $75 for each horse injured or lost, and the shipper took the risk of loss from the condition of the animals themselves, and exempted the carrier from liability by reason of the animals' conduct toward each other. He further released the carrier from delays, unless caused by its own negligence, or the negligence of its agents and employes, in which event the damage should not exceed the value placed on each animal, namely, $75. The shipper agreed that the responsibility of the express company should be that of forwarder only, and not that of a com-

mon carrier, and that the express company uses and relies wholly upon the facilities of transportation furnished by railroads and other carriers, which it does not control or direct. The shipper further agrees that where the animals were accompanied by attendants in his employ, he would take care of them while being forwarded, whether delayed in transit or otherwise. It was the duty of the shipper to satisfy himself whether the cars were safe and in proper condition. There were other conditions in the printed form of contract which appellant used in its business; but under the issues raised and discussed they do not seem to be material to a proper disposition of the case.

A trial was had by a jury, who returned a verdict for the plaintiff for $1,000.

PERCY WERNER, attorney for appellant.

A common carrier is not an insurer against delay, but only with reference to the safe delivery of goods intrusted to it. C. & A. R. R. Co. v. Simms, 18 Ill. App. 68; I. & St. L. R. R. v. Juntgen, 10 Ill. App. 295; W., St. L. & P. R. R. Co. v. McCasland, 11 Ill. App. 491.

It is only where there is an unusual or great delay, under all the circumstances, that the burden is cast upon the carrier to excuse or justify it. Illinois Cent. R. R. Co. v. McClellan, 54 Ill. 58.

ALEXANDER FLANNIGEN and B. H. CANBY, attorneys for appellee.

MR. PRESIDING JUSTICE BIGELOW delivered the opinion of the court.

The declaration consists of two counts. The first count alleges that appellant was a common carrier of live stock for hire, and that appellee delivered to it the horses " to be safely carried by the defendant from the National Stock Yards at East St. Louis to New York City, and at the last named place to be securely and safely delivered to the plaintiff, within a reasonable time then next following, for a certain reward to the defendant in that behalf; yet the

defendant did not safely and securely carry the said horses within a reasonable time and safely deliver them to the plaintiff, but neglected and refused so to do; that the horses were suffered by the defendant to stand in a car in Indianapolis, on a side-track, for the space of twelve hours in the day-time, and were crowded and overheated while so standing in the car; that said car was pulled out of Indianapolis in the night-time, and after such overheating they were chilled by the cool night air, and in consequence thereof took cold and became sick and disordered, by reason of the unreasonable delay in their prompt transportation." The count further alleges that the plaintiff laid out moneys for veterinary surgeons and medicines and that he sustained losses by reason of the lessened value of the animals.

The second count is substantially the same, except that it charges the delay was "gross negligence."

The defendant pleaded the general issue and several special pleas whereupon the parties stipulated that all proper defenses might be made under the general issue.

To dispose of all matters argued by the respective parties in this case would be to write a treatise on the law of bailments as applied to common carriers. The case before us can be disposed of without much difficulty, but inasmuch as our disposition of it will necessitate a new trial, it may be desirable to go a step farther and indicate the views which seem to us should control.

If this court were able to say, as a matter of law, that the contract, which appellant's agent says appellee promised to sign, should govern in this controversy, then such fact would effectually dispose of it; but we are unable to say so, and we think that the court did not err in submitting that question to the jury. Appellee testified in rebuttal that Mr. Thomas never requested him to sign the contract. If the shipment had been one of "commercial horses," and the rate had been the same as prior ones, the evidence would have been highly persuasive that the printed form embodied the final contract of the parties, whether it was in fact signed or not; but the burden of

proof is on appellant, who affirms the completion of the contract before it was signed.   1 Beach on Modern Law of Contracts, Sec. 3.   Neither can we say as a matter of law, that De Mawby's signing appellee's name to the contract bound him, even if it be admitted that De Mawby was in control of the horses—a matter about which there is a serious conflict in the evidence; appellee had himself, in his own person, entered into the contractual relation with the defendant, whatever it may be, and in such a case, where is there room for saying that De Mawby or any one else had implied authority for signing the contract, even if he was in charge of the horses?   None of the persons who accompanied the horses were intrusted with the shipment, a matter that would of necessity have authorized some one of them to make and execute a contract of carriage.

If the limitations contained in the contract which was usually executed between the parties are to be regarded as a notice of intended limitation of liability on the part of appellant, known to appellee, still the law is that there must be clear proof that the owner expressly assented to it, as forming the basis of the contract of carriage; because, notwithstanding the notice, the shipper may insist that the carrier shall transport his goods incident to the common law employment.   The Western Transportation Company v. Newhall, 24 Ill. 466.   If the jury believed the testimony given by Thomas, appellee expressly assented to such notice; but appellee does not admit that Mr. Thomas states the transaction correctly; so that the matter of "express assent" was for the jury.

As we view the declaration, it was not one framed on the theory of appellant's common law duty, to safely carry and deliver; to be sure, there are such allegations in the declaration and there is an averment of breach of that duty.   But these allegations are rather in the nature of mere inducement to the allegations of delay, which afterward follow; and this is evidenced by the structure of both the declaration itself and the first instruction given on behalf of appellee, where the jury are required to find from the evidence whether "the horses, or any of them,

in consequence of said delay in transportation, were damaged or reduced in value." So that the essential issue litigated was the delay in transportation. Now, the law undoubtedly is, that the common law duty of carriage is to safely transport and safely deliver within a reasonable time. Before there can be a breach of this duty, a mere delay is wholly insufficient to create a liability. It must be "an unreasonable delay, which is such as involves some want of ordinary care or diligence" on the part of the carrier. C. & A. R. R. Co. v. Simms, 18 Ill. App. 68, and cates cited.

"The reasons upon which the extraordinary responsibility of the common carrier for the safety of the goods is founded, do not require that the same responsibility should be extended to the time occupied in their transportation. The danger of loss by robbery or embezzlement or theft by collusion and fraud on his part has no application when the mere time of the carriage is concerned." Hutchinson on Carriers, Sec. 330.

The first instruction given on the part of appellee does not submit the question to the jury whether there was, under all the circumstances, a negligent delay, but from the mere fact of the delay, the liability is created. True, the car was out of order when it arrived in Indianapolis, but the evidence is that it had been inspected. Unless the fault in the drawbar was such that reasonable care in the inspection would have revealed the defect, there was no negligence on the part of appellant in that regard. Sack v. Dolese, 137 Ill. 129. On this feature of the cause of the delay there is no evidence. We can not hold that because the drawbar was out of order, appellant was negligent and caused the delay. The presumption, until it is overturned by evidence, must be that the inspection of the car was efficient.

But it is said, the evidence tends to show there was a special contract with appellant that it should transport the horses by the particular train whose schedule time was some time in the early morning of November 11th in New York City; and therefore the delay beyond that time was a breach of the contract which makes appellant liable in

damages, under the authority of C. & A. R. R. Co. v. Thrapp, 5 Ill. App. 502, and Schouler on Bailments, Sec. 404, where the rule is stated to be that a special undertaking exacts special fulfillments. It must be admitted the evidence tends to prove such contract, but the declaration does not count on any such engagement. The only time alleged in either count is the duty to carry within a "reasonable time,"—a matter which is clearly for the jury to pass upon, whereas the same instruction declares it to be the duty of the defendant to transport "promptly." The case made by the declaration must be the case proven, on principles too familiar to need the support of authority.

As to how this case should be properly submitted to another jury on the question of delay, and the carrier's common law liability, we are much averse to even indicate our views, and what we say is only tentatively, and in no way binding in the future disposition of this case. On the part of appellee it is contended that he is entitled to an instruction which states the liability of appellant to be that of an insurer for the safe delivery of the animals excepting the "act of God" and public enemies, entirely disregarding the character of the goods. On the part of the appellant it is contended that no instruction can be given to the jury which does not recognize the further exemption of the carrier's liability as insurer of live stock, because of the inherent liability of such freight to misfortune, irrespective of any fault of the carrier. These matters bring to view anew all the perplexing questions which have engaged the courts with reference to the proper submission to the jury of the issues in such cases. No one case, or even a series of such cases, can in a particular instance furnish all the criteria by which the controversy may properly go to the jury. See Schouler on Bailments, Sec. 23 (3d Ed). Whether live stock bailments for transport shall be deemed a further exception to the carrier's insurance liability where the damage arises out of the "vitality" of the animals, or whether it is merely considered as a fuller statement of the common law rule which, on the question of the insurance liability, took note of the

inherent quality of the freight, we do not believe it important. We think the true rule in any event, is the one which, in a case where the carrier has the sole custody of the animals, casts the burden of proof on the carrier to show that he exercised ordinary care in the carriage of the freight—in other words, that he is free from negligence which, as an efficient contributing cause, brought about the damage. Burke v. U. S. Express Co., 87 Ill. App. 505. In a case, however, where the owner or his employes have the custody and control of the animals, and the carrier merely furnishes the motive power, the issues are necessarily wider, when it is claimed the carrier is responsible for damage through sickness of the animals, contracted by colds.

Was the delay negligent, and if so was it the proximate cause of the sickness? Were the employes of the shipper in the exercise of ordinary care for the safety of the animals?

Without going further in this connection, we think that of the many cases we have examined, the case of Clarke v. Rochester & Syracuse R. R. Co., 14 N. Y. 570, is the most lucid statement of the principles which in the end would seem to be important in this case, on the declaration as it stands, that we have been able to discover.

For the errors indicated the judgment is reversed and the cause remanded for a new trial.