THE ILLINOIS CENTRAL RAILROAD COMPANY, Appellant, *v.*
DAVID A. MORRISON and JOHN CRABTREE, Appellees.

### APPEAL FROM COLES.

Railroad companies are common carriers, and, as such, have a right to restrict their liability, by such contracts as may be specially agreed upon, they still remaining liable for gross negligence or willful misfeasance.

Where A contracted to pay a certain price for cars to carry four hundred cattle, and delivered a part, signing a contract restricting the liability of the company, it will be presumed that other persons, who delivered the remainder of the cattle, acted as his agents, and had authority to sign similar contracts.

THIS was an action on the case, brought by the appellees against the appellant, as common carriers, in the court below, for damage done to cattle of appellees, by delay in the transit while being carried from Urbana to Chicago, by appellant. The declaration also contained a count in trover. The defendant pleaded not guilty, and gave notice of special matters to be relied on for the defense, and the case was submitted to a jury.

The evidence showed that shortly prior to November 10, 1856, the plaintiff, Morrison, made a special contract with the defendant to furnish cars sufficient to ship about four hundred cattle from Urbana to Chicago, on defendant's railroad; that by the terms of the contract, defendant was to furnish cars at reduced rates, and plaintiff, Morrison, was to pay $33 per car, and sign the usual release against risks, delays, &c.; that Morrison did not, at that or any other time, disclose to defendant that said cattle, or any portion of them, were owned by him in partnership with his co-plaintiff, Crabtree, or by any one else, but contracted in his individual name for said cars; that on November 10th, 1856, at noon, a lot of the plaintiff Morrison's individual cattle, and two hundred and fifty-six of the cattle belonging to the plaintiff Morrison and the plaintiff Crabtree, in partnership, arrived at Urbana, having been driven there together; that all of Morrison's individual cattle and about eighty head of the partnership lot were loaded and sent off that same night, and the rest, one hundred and seventy-six head, were loaded that night and the next morning in eleven cars, the most of which were box cars, and started to Chicago on the afternoon of the 11th; arrived at Onarga, forty miles from Urbana, one hour before sundown the same day; some of the cattle, in two box cars, got down and required assistance, and they were left; the rest arrived at Chicago at 1 or 2 o'clock A. M. on the 12th, and were unloaded at 9 o'clock the same morning, as the railroad agent would not get up to unload them sooner. The cattle were in bad condition, and would shrink 125 lbs. above ordinary shrinkage in regular

time of transit; that said cattle were contracted at Chicago at $3 per hundred; that one ox, weighing 1,680 lbs., was dead, and defendant sold him and got the money; that the cattle were not weighed before leaving Urbana, nor just after arriving at Chicago; that the cattle left at Onarga were turned out in the railroad pen; that the pen needed repairs, and plaintiffs repaired it at $6 expense; that they hired an extra car for their cattle, and paid $25 to defendant for it; that defendant's agent at Onarga required Morrison's son, who had charge of the cattle, to sign a sealed contract, whereby it was agreed that in consideration that defendant would charge freight at $25 instead of first class rates, the owner of the stock agreed to release the defendant from all liability for escape or injury, except such as happened through the gross negligence or default of the agents of the defendant, which contract was signed "D. A. Morrison [SEAL]"; that the cattle got no water or feed at Onarga; that they left Onarga at noon on the 12th, and arrived at Chicago at 9 o'clock that night; that the cattle would shrink, with ordinary shrinkage; that on 15th November, 1856, at noon, ninety-one other cattle were brought to Urbana; that they commenced loading them, part in box cars and part in slat cars, at 9 o'clock P. M. the same day, and started to Chicago at 11 o'clock; that when they got sixteen or eighteen miles from Urbana, the engines gave out and they were stopped; that the conductor said that one of the engines was of no account, and that the superintendent knew it when he sent it out; that they got to Chicago on the 17th, at noon; that the cattle would shrink from 150 to 175 lbs. above ordinary shrinkage; that they were worth $2.75 to $3 per hundred; that they were contracted at Chicago at $3; that the cattle were Morrison's and Crabtree's; that they were shipped in five cars; that the equal running time was from twelve to fourteen hours; that when the first lot, of November 10th, containing Morrison's individual cattle, and the eighty head of the partnership lot, were loaded, Morrison signed, in his individual name, an instrument of release, under seal, whereby Morrison agreed that in consideration that the defendant having agreed to charge freight at the rate of $33 per car load, instead of first class rates as fixed by the tariff of the company, he agreed to release the defendant from all liability for damage to said stock, and from all claims relating thereto, except such as should arise from the gross negligence or default of the agents of the company; it was proved and agreed, however, that the cattle mentioned in said release were not in controversy in this suit; that when the ninety-one head were shipped, on the 15th November, James Crabtree, who had charge of the cattle, signed the plaintiff Morrison's name to a release

of the same kind as that mentioned above, but had no authority to do so.

There was also introduced several receipts signed by D. A. Morrison, in his individual name, for all the cattle in controversy, stating that said cattle were received in good order from the defendant, at Chicago, except that one steer was dead. It was also proved that Morrison several times refused to sign said receipts before he finally did sign them, and that Morrison was present and saw all the cattle before he signed the receipts; also, that a part of the cattle were kept back until he would sign the receipts. The defendant objected to letting in evidence to invalidate the receipts.

The court, EMERSON, Judge, presiding, refused to allow the instruments of release, signed by Morrison's son and by James Crabtree, to go in evidence; to which ruling the defendant excepted.

The court instructed the jury, for plaintiffs, that if the cattle in question were partnership cattle, and that one of the plaintiffs made the contract for shipping them without naming his copartner, and injury resulted to the cattle by negligence of defendant, then the partners could maintain an action in their joint names for such injury. To the giving of this instruction the defendant objected.

The defendant asked the court to instruct the jury that if there was a special contract for the shipment of the cattle, the defendant was not a common carrier as respected that transaction, and that suit should have been brought upon such contract, and not against them as common carriers; that if Morrison made a contract with defendant for the hire of cars, at a given price, to transport the cattle, and the cattle were shipped under such contract, without disclosing at the making of the contract that he and his co-plaintiff were partners in a portion of the cattle, suit should have been brought in Morrison's name alone; that if defendant furnished cars and motive power for a less price than their regular price, and plaintiffs agreed to assume the risk, then they must sue upon such contract; which instructions were refused by the court; to which ruling the defendant excepted.

The jury found a verdict of $1,200 for plaintiffs. The defendant moved for a new trial, which was overruled, to which the defendant excepted.

Errors assigned:

Refusal to admit the two releases in evidence;

Admitting evidence to invalidate the receipts;

Giving plaintiffs' instructions, and refusing defendant's instructions;

That the verdict was contrary to law and evidence ; Overruling motion for new trial.

A. LINCOLN, O. B. FICKLIN, and H. C. WHITNEY, for Appellant.

C. H. CONSTABLE and A. GREEN, for Appellees.

BREESE, J. The question presented in this case is one of importance to the business public, and to the railroad interests, and has received due attention from the court.

That railroad companies are common carriers cannot be disputed, and, being so, they are bound and controlled, as a general principle, by all the common law rules applicable to such a position—they becoming, in fact, insurers.

Until the establishment and use of railroads for the conveyance of property, it was not generally considered that common carriers could, by special contract, limit their liability, or take themselves out of the severe rules which governed such business.

At this time, railroads have acquired much of the carrying trade of the country, and reversing the former order of things, now carry the very animals which propelled the old machines used for that purpose. It was quite an era in trade and transportation, when speedy means were devised by railroads for carrying live stock from one extreme of the country to the other, and, on its origination, new rules were found necessary, or modifications of old ones, as applicable to this new system, which, whilst protecting these magnificent and costly enterprizes, should be so guarded that no injury to the public should flow from them.

Transportation of live stock in railroad cars, in their rapid motion, is attended with great hazard, against which, if the companies owning them had no power of protection, irretrievable ruin to them might be the necessary consequence. Accordingly, we see that the courts in England, where the railroad system, though yet perhaps in its infancy even there, has been brought to great perfection, and in most of the older and well regulated, and highly commercial States of our Union, have declared that these companies may protect themselves from their general liability as common carriers, by special contracts.

The facts in this case show that about the tenth of November, 1856, one of the plaintiffs, D. A. Morrison, without disclosing any partnership, contracted with the agent of the Illinois Central Railroad Company at Urbana, for a sufficient number of cars to transport about four hundred head of cattle from that station to Chicago, at the rate agreed upon of thirty-three dol-

lars a car, Morrison agreeing to sign the usual release, as to risks, delays, etc. On the 10th of November, Morrison arrived at Urbana with about four hundred head of cattle, and commenced loading them in the cars furnished by the agent, and had placed one hundred and eighty-seven head in eleven cars. At which time he signed a release in this form :

Morrison having this day loaded into the cars of the Illinois Central Railroad Company, numbered 10, 14, etc., the following live stock, viz. : 187 head of cattle, (more or less), and the said Railroad Company having agreed to charge freight upon said live stock only at the rate of thirty-three dollars per car-load, instead of first class rates as fixed by the tariff of the said Company, I do hereby, in consideration of the said reduction of charge for freight, declare that the said live stock is to be transported at my risk, and I do agree to release, and do release the said Railroad Company from any and all claims which may or might arise from damage or injury to said stock while in the cars of the said Company, or for delay in its carriage, or for escape thereof from the cars, and generally, from all claims relating thereto, except such as may arise from the gross negligence or default of the agents or officers of the said Company, acting in the discharge of their several official duties.

Witness my hand and seal, this 10th day of November, 1856.

D. A. MORRISON. [SEAL]

*Attest:* WILLIAM T. HAVEN.

A portion of these cattle, it appears, were left at Onarga, a station north of Urbana, and another car obtained there, in which they (36 head,) were placed, and a similar release executed, on the 12th November, in, the name of D. A. Morrison, by his son, without any authority, as he testifies, from his father. And, on the 15th, ninety-one head were shipped, and a similar release executed by James Crabtree in the name of D. A. Morrison, but, as he testifies, without any authority from Morrison. These two last releases were excluded from the jury.

The parol agreement, made by Morrison in person, in the view we have taken of the case, attaches to the whole transaction, to the extent, at least, of four hundred head of cattle, no matter whose they were, whether owned by Morrison alone, or jointly with others. The agreement made, was for the transportation of four hundred head, and they were delivered at different times. For one hundred and eighty-seven head of these cattle, delivered by Morrison himself, he signed the above release or agreement, and by sending other cattle by his agents, he sent implied authority with them to carry out the parol agreement he had made. They were his agents to deliver under the parol contract, and to do all acts necessary and proper in furtherance thereof. It was one entire transaction, an unit, embracing Crabtree's interest as well as Morrison's, and parties

so situated cannot be allowed to split up a contract into several distinct parcels and liabilities.

The declaration is in case, and sets out nothing more than the general and ordinary duties of defendants as common carriers, with a count in trover added.

In such case, the defendants have a right to defend themselves by the special contract.

The defendants have paid a valuable consideration for the risks assumed by the plaintiffs, by accepting reduced rates, and the plaintiffs have had the full benefit of the reduction. It would be great injustice to require the company to pay for escaping risks, and then burden them with the losses against which, by fair contract, they have purchased exemption.

The whole case shows, merely, a hiring of cars and motive power—there being no complete delivery of the cattle to the defendants, as the owners, or their agents, or some one of them, accompanied them and had them in their own charge. They could not be stowed away, like inanimate matter, and had the power of locomotion, and were exposed to various accidents, the risk of all which the company paid the plaintiffs to assume.

We think the rule a good one, as established in England and in this country, that railroad companies have a right to restrict their liability as common carriers, by such contracts as may be agreed upon specially, they still remaining liable for gross negligence or willful misfeasance, against which good morals and public policy forbid that they should be permitted to stipulate. See 1 Am. Railway Cases, in note, page 181 ; Redfield on Railways, 264 and onward ; 2 Ohio State Reports, 131.

As the Circuit Court seemed to have entertained views of the law different from those here expressed, the judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*