## TYLER, ULLMAN & CO.

*v.*

## THE WESTERN UNION TELEGRAPH COMPANY.

1. TELEGRAPH COMPANIES—*their duty and liability.* A telegraph company is a servant of the public, and bound to act whenever called upon, their charges being paid or tendered. They are, in that respect, like common carriers, the law imposing upon them a duty which they are bound to discharge. The extent of their liability is, to transmit correctly the message as delivered.

2. SAME—*of restricting their liability by contract—necessity of repeating messages.* Where a party, desiring to send a telegraphic dispatch, is required by the company to write his message upon a paper containing a condition exonerating the company from liability for an incorrect transmission of the message unless it shall be repeated, and at an additional cost therefor to the sender, it is held that such a restriction, even if it be regarded as a contract, is unjust, without consideration, and void.

3. Nor is such a restriction upon the liability of the company relieved of its objectionable character by a stipulation in the contract that the company will insure the accurate transmission of the message by a special agreement to be made, in writing, with the superintendent of the company, the amount of risk to be specified in the contract and paid at the

time of sending the message. Such a provision would not be available to persons in localities were there was no superintendent, and would occasion inconvenient delay even where such officer could be found.

4. It is against public policy to permit telegraph companies to secure exemption from the consequences of their own gross negligence, by contract. So, notwithstanding any special conditions which may be contained in a contract between a company and the sender of a message, restricting the liability of the former in case of an inaccurate transmission of the message, the company will still be liable for mistakes happening by their own fault, such as defective instruments, or carelessness or unskillfulness of their operators, but not for mistakes occasioned by uncontrollable causes.

5. SAME—*whether a contract exists is for the jury to determine, not the court.* Whether a paper furnished by a telegraph company, containing conditions and restrictions in respect to the liability of the company in case of an incorrect transmission of messages, and upon which a message is written and signed by the sender, is a contract or not, depends upon the fact whether the sender had knowledge of such conditions and restrictions and assented thereto; and whether or not such regulation was brought to the notice of the sender so as to fix knowledge upon him, is a question of fact to be determined by the jury, and not by the court. Slight evidence of assent will, no doubt, suffice, but it is for the jury to determine.

6. SAME—*burden of proof.* In an action against a telegraph company to recover damages resulting from an alleged incorrect transmission of a message, if the plaintiff prove the inaccuracy of the message, the company, to exonerate themselves, must show how the mistake occurred. In the absence of any proof on their part, in that regard, the jury must presume a want of ordinary care on the part of the company.

7. SAME—*of disclosing to the company the importance of the message.* A telegraphic message was sent from Chicago to New York, as follows: "Sell one hundred Western Union. Answer price." It was *held,* the dispatch sufficiently disclosed to the operator the nature of the business so as to inform him of the importance of its correct transmission. But be a message of great or trifling importance, the company are bound to transmit it literally—at least to use the highest degree of care and skill in their efforts to do so.

8. SAME—*duty of the receiver of the message.* The receiver of a telegraphic message is not required to telegraph back to ascertain the correctness of the message. The company is bound to send the message correctly in the first instance.

9. MEASURE OF DAMAGES—*in case of an incorrect transmission of a telegraphic dispatch.* A party in Chicago delivered to a telegraph company, in that city, a message, directing his banking house in New York to sell

one hundred shares of a certain character of stocks, which amount was then held by the banking house for a customer. The message, as delivered in New York, directed the sale of *one thousand shares*, and thereupon the party receiving the message sold that amount, having to go into the market to buy the residue: *Held*, if the sender of the message was compelled to, and did, purchase nine hundred shares of the stock to replace that so sold by reason of the carelessness of the company in transmitting the message, and that, in the interval between the selling one thousand shares and the repurchase of the nine hundred shares to replace the extra number of shares sold, that stock had advanced in price, this advance, in an action against the company, would be the measure of damages.

10. INSTRUCTION—*of it being based upon evidence*. It is not essential that there should be direct testimony upon a point in order to afford a proper basis for an instruction,—it is sufficient if there are circumstances from which the fact involved may be inferred.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. ROGERS & GARNETT, for the appellants.

Messrs. DENT & BLACK, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action of assumpsit to recover damages of the Western Union Telegraph Company for alleged carelessness in transmitting a dispatch for appellants from Chicago to the city of New York. The delivery of the message at the company's office in Chicago to the operator there, by one of the plaintiffs, is alleged, and proper averments of negligence and carelessness on the part of the company are found in the declaration, and proper averments of damage. The defendant pleaded non-assumpsit, with notice of special matter.

It appears the message was written on one of the blanks prepared by the company, which contained the following stipulations:

"In order to guard against and correct, as much as possible, some of the errors arising from atmospheric and other causes appertaining to telegraphy, every important message should be *repeated* by being sent back from the station at which it is to be received, to the station from which it is originally sent.

"Half the usual price will be charged for repeating the message, and the companies will not hold themselves responsible for errors or delays in the transmission or delivery, nor for the non-delivery of *repeated messages*, beyond two hundred times the sum paid for sending the message, unless a special agreement for insurance be made in writing, and the amount of risk specified on this agreement and paid at the time of sending the message. Nor will these companies be responsible for any error or delay in the transmission or delivery, or for the non-delivery of *any unrepeated message* beyond the amount paid for sending the same, unless in like manner specially insured, and amount of risk stated hereon and paid for at the time.

"No liability is assumed for errors in cypher, or obscure messages, nor for any error or neglect by any other company over whose lines this message may be sent to reach its destination, and these companies are hereby made the agents of the sender of this message to forward it over the lines extending beyond those of these companies. No agent or employee is allowed to vary these terms or make any other verbal agreement, nor any promise as to the time of performance, and no one but a superintendent is authorized to make a special agreement for insurance. These terms apply through the whole course of this message on all lines by which it may be transmitted."

The message when written, and as delivered to the operator at Chicago, read as follows:

"Dated CHICAGO, Oct. 29, 1866.

"To J. H. WRENN or A. T. BROWN:

Sell one hundred (100) Western Union. Answer price.

T. U. & Co."

As delivered to Wrenn, in New York, the message read as follows:

"Dated CHICAGO, ILL.

"To J. H. WRENN, care GILLMAN, SON & CO.:

Sell one thousand (1000) Western Union. Answer price.

T. U. & Co."

It is averred in the declaration that Wrenn understood the words "one hundred Western Union" to mean one hundred shares in the Western Union Telegraph Company, which number of shares, it appears, the banking house of plaintiffs was then carrying for a customer. On receipt of the message, Wrenn sold one thousand shares of this stock, and to do so, was obliged to go into the market and purchase nine hundred shares, to replace which he had to buy on a rising market the same number of shares, so that the difference in the selling and buying price amounted to seven hundred and twenty-nine dollars and seventy-seven cents, which amount was wholly lost to the plaintiffs.

The court, on its own motion, having refused instructions asked by plaintiffs, charged the jury as follows:

"The dispatch in question, in this case, being sent upon one of the printed blanks of defendant, the printed heading of that blank constitutes a contract between the parties, by the terms of which both parties are bound; and as one of these terms is, that the defendants are not liable for any errors in the transmission of an unrepeated message beyond the amount paid for sending the same, the plaintiffs can only recover that amount, with interest on the same, from the time it was paid to this time, in this suit. Transmission means all that happens between the receipt of the dispatch here from the plaintiffs, and its delivery to them in New York."

It was admitted the message in question was not repeated.

The jury found for the plaintiffs, assessing their damages at two dollars and sixty cents, being the cost of the message, with interest.

A motion for a new trial was overruled and judgment rendered on the verdict, to reverse which the plaintiffs appeal, and make several points, one of which is the refusal of the instructions asked by them on the trial of the cause.

Those instructions are as follows:

"If the jury believe, from the evidence, that the dispatch sent by Tyler, Ullman & Co. to John H. Wrenn, on the 29th

day of October, 1866, was erroneously and negligently read by the operator in Chicago, and that said dispatch was transmitted to said Wrenn in the words as received by him, on account, and as the result of such erroneous and negligent reading by the operator in Chicago, then the verdict must be for the plaintiffs if they suffered pecuniary loss by such error and negligence."

"If they believe, from the evidence, that the dispatch sent by Tyler, Ullman & Co. to John H. Wrenn, on the 29th day of October, 1866, was correctly transmitted from Chicago to New York, and was correctly received in New York at the office of the said defendants, yet if they believe, from the evidence, that said dispatch, although correctly received by defendants, was erroneously and negligently transcribed by their agents in New York, and was delivered by said agents to said Wrenn so erroneously and negligently transcribed, and that such error caused any pecuniary loss and damage to the plaintiffs, then the verdict must be for the plaintiffs."

"If they believe, from the evidence, that a mistake was made in transmitting the message through the gross negligence of defendants, or their servants, and that plaintiffs suffered damage by reason of such mistake in transmitting said message, the defendants are responsible for such damage, although the jury may believe, from the evidence, that plaintiffs used one of the forms of defendants, having the terms printed at the top, as shown by the form copied in the notice accompanying defendants' plea, and that said plaintiffs assented and agreed to such terms, and did not require said message to be repeated, or its correct transmission insured."

"That plaintiffs were not bound by the terms printed at the top of the forms commonly used by defendants, as set out in the form copied in defendants' notice accompanying their plea, if they delivered their message to defendants for transmission by telegraph, and defendants accepted it for that purpose, without plaintiffs' consent or agreement to be bound by such terms."

These instructions, in connection with that given by the court, open up the merits of this controversy, and we have given to the questions raised by them full consideration. It is a case of the first impression in this court, requiring us to examine all the authorities cited, and such others as were within our reach, and we find them not entirely harmonious. It is contended by appellants that telegraph companies are common carriers, and under the same common law liabilities.

In the earlier cases reported they were so held. *McAndrew* v. *The Electric Telegraph Co.* 33 Eng. L. and E. R. 180, decided in 1855. It was also held they could restrict their liability by contract, and that the paper containing the message, signed by the plaintiff, which was identical with the one in this case, was such contract.

They were also held to be common carriers in *Parks* v. *Alta California Telegraph Co.* 13 Cal. 422, decided in 1859. The counsel for the company argued against this proposition, and contended that the rules of the common law governing common carriers did not apply to telegraph companies. He insisted they could not be regarded as insurers, for the reason that a message is without value. The court said there was no difference in the general nature of the legal obligation of the contract between carrying a message along a wire and carrying goods or a package along a route. The physical agency may be different, but the essential nature of the contract is the same. The breach of contract in one case or the other, is, or may be, attended with the same consequences; and the obligation to perform the stipulated duty is the same in both cases. The importance of the discharge of it, in both respects, is the same. In both cases the contract is binding, and the responsibility of the parties for the breach of duty is governed by the same general rules.

Strong reasons might be urged in favor of holding these companies to the severe liability of common carriers, but the current of authority at this time is not, as admitted by appellants, in that direction. Whilst their liability is held to be

analogous to that of common carriers, who are insurers of the safe delivery of the articles intrusted to them, it is considered, in view of the means employed by telegraph companies to transmit messages, and their liability to sudden accidents which can not be foreseen and provided against, to hold them as insurers of the safe delivery of every message intrusted to them, would be too rigid a rule. Cases so holding, hold, nevertheless, that they are liable for a failure to exercise the highest degree of diligence and skill in the performance of their duty.

The case of *Rittenhouse* v. *The Independent Line of Telegraph*, 44 N. Y. 263, is one of this description. There it was held, the failure to transmit a message in the form in which it was received by the operator, was *prima facie* negligence, for which the company is liable, and the *onus* is on the company to show the mistake occurred by no fault of their own.

This case came up from the court of common pleas, and is reported in 1 Daly, 547, and was an unrepeated message.

To the same effect is *New York and Washington Printing Telegraph Co.* v. *Dryburg*, 35 Penn. 298. This action was in tort, and brought by the receiver of the message. The court say, the wrong of which the plaintiff complained consisted in sending him a message different from that which they had contracted with LeRoy to send. That it was a wrong, is as certain as that it was their duty to transmit the message for which they were paid. Though telegraph companies are not, like carriers, insurers for the safe delivery of what is intrusted to them, their obligations, as far as they reach, spring from the same sources—the public nature of their employment, and the contract under which the particular duty is assumed. One of the plainest of their obligations is, to transmit the very message received.

They further say, the company claimed that their operator was a skillful and careful one. Then his negligence in this instance was the more apparent and inexcusable.

In *Elwood et al.* v. *The Western Union Telegraph Co.* 45 N. Y. 549, the court said, the agent was placed in the office and in the control of the instruments to use them in transmitting messages for a compensation. If the agent performed the duty in a negligent manner, whereby the plaintiff was injured, the principal is clearly liable. Transactions of the most important character are daily carried on by means of telegraphic communication, and the confidence which the public is invited to, and does repose, in the care with which the proprietors of these lines conduct the business, is a source of large remuneration to such proprietors. They have a corresponding degree of responsibility, and must be held to the exercise of such care and caution as it is in their power to employ, in order to avoid being made the instruments of deception and fraud.

Another class of cases holds these companies are bound to the exercise of reasonable diligence and skill. *Washington and N. O. Telegraph Co.* v. *Hobson & Son*, 15 Grattan, 122. In this case the declaration did not allege negligence on the part of the company, and one instruction that the defendants were not responsible as common carriers, but only as general agents, for such gross negligence as in law amounts to fraud, was not authorized by the pleadings, and was properly refused.

In *Ellis* v. *The American Telegraph Co.* 13 Allen, 226, the court said, it would be manifestly unreasonable and unjust to annex to a business of such a nature the liability of a common carrier, or to require that those engaged in it should assume the risk of loss and damage arising from causes the operation of which they could neither prevent nor control. But, although they ought not to be held to such a standard of diligence, they are not exempt from all responsibility for a want of fidelity and care in the exercise of the employment which they undertake to carry on. There can be no doubt that, in the ordinary employments and occupations of life, men are bound to the use of due and reasonable care, and are liable for the consequences of carelessness or negligence in the

conduct of their own business to those sustaining loss or damage thereby. We can see no reason why this rule is not applicable to the business of transmitting messages by telegraph. The court then comments on the efficacy of the regulation of the company requiring a message to be repeated, and hold it is a reasonable regulation.

In *Western Union Telegraph Co.* v. *Carew*, 15 Mich. 525, the court say, this is not a case which calls upon us for laying down the rules which must be held to govern as to the degree of skill, care and diligence to be required in the transmission of messages. But, doubtless, the use of good apparatus and instruments would be required, and reasonable skill and a high—perhaps the very highest—degree of care and diligence in their operation. And when an error has occurred in the transmission of a message, it may be found that they ought to be held *prima facie* guilty of negligence, the *onus* of proof resting upon them to show diligence, the means for doing this being peculiarly within their knowledge and power.

Other cases on this point might be cited: *Birney* v. *New York and Washington Telegraph Co.* 18 Md. 341 ; *Breese et al.* v. *U. S. Telegraph Co.* 45 Barb. 275.

All these cases hold, as do the following, that these companies may limit or modify their common law liability by stipulations, such as given in evidence in this case. *Wann* v. *Western Union Telegraph Co.* 37 Mo. 472 ; *Camp* v. *Western Union Telegraph Co.* 1 Met. (Ky.) 164. This last case holds, when a message is not repeated, it will be regarded as sent at the risk of the sender, and the company will not be liable for damages resulting from a mistake not occasioned by negligence or the want of skill of the agents of the company.

An examination of the decided cases shows that the law applicable to telegraph companies is in an unsettled condition.

It must, however, be conceded that there is great harmony in the decisions that these companies can protect themselves from loss, by contract, and that such a regulation as the one

under which appellees defended, is a reasonable regulation, and amounts to a contract.

We are not entirely satisfied with the conclusions announced in some of these decisions.

Whether the paper furnished by the company on which a message is written and signed by the sender, is a contract or not, depends on circumstances. In an analogous case in this court, *Adams Express Co.* v. *Haynes,* 42 Ill. 89, and in *Ill. C. R. R. Co.* v. *Frankenberg et al.* 54 ib. 88, it was held, the simple delivery of a receipt to the shipper is not conclusive upon the latter. Whether he had knowledge of its terms and assented to its restrictions, is for the jury to determine as a question of fact upon evidence *aliunde,* and all the circumstances attending the giving the receipt are admissible in evidence to enable the jury to decide that fact. The receipt given by the company, in this case, was declared on its face to be a contract, and was as full for such purpose, in the terms employed, as is the form in the case now before us. It was a question for the jury in that case, but in this case the court undertook to determine the question and decide the fact. We think this was error.

We do not see why the same rule, in this respect, should not apply to telegraph companies as is applied to express companies and railroad companies. In regard to the latter, it is always held, whether or not such a regulation was brought to the notice of the shipper so as to fix knowledge upon him, to be a fact for the jury. *Brown* v. *Eastern Railroad Co.* 11 Cushing, 97. Slight evidence of acceptance, or assent to such regulation, would, no doubt, suffice; but it is for the jury to determine.

In the various and somewhat conflicting decisions of the courts on the questions presented, we are inclined to hold, admitting the paper signed by the plaintiffs was a contract, it did not, and could not, exonerate the company from the use of ordinary care and diligence, both as to their instruments and the care and skill of their operators.

432　　Tyler, Ullman & Co. *v.* W. U. Tel. Co. [Sept. T.,

Opinion of the Court.

The plaintiffs having proved the inaccuracy of the message, the defendants, to exonerate themselves, should have shown how the mistake occurred. This proof was not in the power of the plaintiffs, and was in the power of the defendants. In the absence of such proof, the jury would be authorized to presume a want of ordinary care on the part of the defendants.

If the error was caused by atmospheric disturbances, or a momentary displacement of the wires, the defendants knew it, and ought to show it. In the absence of any proof on their part, the jury should be told the presumption was, a want of ordinary care on the part of the company. The court, however, refused to instruct the jury that the company was liable for gross negligence. It is the settled doctrine of this court that a railroad company can not purchase exemption from gross negligence, or protect itself against such; that it would be against public policy so to contract. We see no reason why the rule should not be the same in regard to telegraph companies, for they are, like railroads, public institutions, having duties to perform to the public.

On general principles, we must hold the company, notwithstanding the special conditions relied upon, is responsible for mistakes happening by their own fault, such as defective instruments, or carelessness or unskillfulness of their operators, but not for mistakes occasioned by uncontrollable causes. *Sweatland* v. *Illinois and Mississippi Telegraph Co.* 27 Iowa, 433.

This company sought the patronage of the public in the exercise of their employment, and assured that public they would use at least ordinary care and diligence in their business, both as to their instruments and as to the skill of their operators. It can not be claimed the contract in question was designed to relieve them from that, nor should it. They assure the public they have the most approved instruments and employ skillful operators, and they further assure the public that due care and diligence shall be exercised in conducting their business. If the conditions relied upon were designed to shield the company from consequences flowing from a want

of skill of operators, or insufficiency of instruments, which would be gross negligence, such a condition would be contrary to public policy, and void.

The pretext for imposing the conditions in question is, "to guard against and correct, as much as possible, some of the errors arising from atmospheric and other causes appertaining to telegraphy, etc."

In these "other causes," it can not be allowed to embrace defective instruments or unskillful operators, for the company are bound, by their obligations to the public, to provide the best—certainly, to provide operators of sufficient skill and intelligence, and instruments of the most approved construction. "Other causes" must mean only such causes as appertain specially to the business of telegraphy. Defective apparatus and unskillful operators appertain to business and public employments other than telegraphy. A railroad company can not be excused on failing to employ competent engines, and servants to manage and conduct them and the trains to which they are attached. If a loss happens by reason of insufficient engines, or by the incompetency of their employees, they are liable.

We can not hold that the printed conditions in evidence, in this case, protect this company from losses and damage occasioned by causes wholly within their own control. They must be confined to mistakes due to the infirmities of telegraphy, and which are unavoidable.

A point is made by appellees, that the negligence of appellants materially contributed to the loss incurred. This is a question of fact for the jury, and if it is established, they can not recover.

But we fail to discover any evidence of contributory negligence on the part of the plaintiffs. And as to the receiver of the message, it was not his duty to telegraph back to ascertain the correctness of the message. The company was bound to send the message correctly in the first instance.

28—60TH ILL.

434    TYLER, ULLMAN & Co. *v.* W. U. TEL. Co. [Sept. T.,

Opinion of the Court.

It is urged by appellees, in their comments on the instructions asked by plaintiffs below, that the first two were properly refused by the court, for the reason there was no evidence on which to base them.

There may have been no direct testimony on this point, but a jury is permitted to infer a fact from circumstances proved to them. It was in proof by John H. Wrenn, and not attempted to be contradicted or questioned, that so soon as he received a telegram from Chicago, which he did on the 30th of October, stating that an error had been committed, and ordering him to cover the extra nine hundred shares, he went immediately to the office of the company in New York and asked them to correct it. They told him the error had not occurred at their office, but in Chicago.

We think the attention of the jury was properly called by these instructions to this testimony, as it was not contradicted. It was in the power of the defendants to show the mistake did not occur at the Chicago office, by producing the original, which was in their possession. This they failed to do.

If the fact was, the error occurred in the Chicago office, then the plaintiffs' right to recover is unquestionable, for there is no excuse for failing to start a message correctly. That fact would show a defective instrument or an unskillful operator, and for this the company would not be exonerated.

Another point is made by appellees, not undeserving notice, and that is, a want of knowledge on the part of the company of the importance or value of the message. It is a sufficient answer to this to say, that, be a message of great or trifling importance, the company is bound to transmit it literally—at least, according to some of the authorities, to use the highest degree of skill and care in their efforts so to do. But the dispatch disclosed the nature of the business as fully as the case demanded. A similar case is reported in 55 Penn. 262, *U. S. Telegraph Co.* v. *Wenger.* The dispatch was, "Buy fifty (50) Northwestern, fifty (50) Prairie Du Chien, limit

forty-five (45)." It was held, this dispatch disclosed the nature of the business to which it related, and that a loss might occur if it was delayed. In this case a great loss has occurred, by incorrect transmission.

As to the point that appellees should have had an opportunity to replace the stock before Wrenn went into the market for that purpose, it is apparent, from Wrenn's testimony, the company had such opportunity, for he testifies he went to them, in New York, and requested them to correct the error. On their refusal, on the pretext that the error occurred at the Chicago office, he then purchased.

We have carefully read and considered all that has been written on the subject of the "Art of Telegraphy" which our libraries can furnish, and we are not satisfied with the grounds on which a majority of the decisions of respectable courts are placed.

In the first place, modern telegraphy is not now an infant art. It sprang into existence from the teeming brain of one, now no more, who had the boldness to attempt to render subservient to the wants of man the most subtle element of nature, and by its mysterious potency convey ideas, wants and wishes to the farthest limit of civilization, and with the speed of its kindred element. In its infancy, it scarcely ever failed to perform its office. Thirty years have witnessed vast improvements in the art—a higher knowledge of the subtle agent called into use—more finished instruments, and almost perfect skill in those who operate them; so that, setting aside atmospheric causes which have not yet been provided against, it may be asserted as an incontestible truth, that, given a line of wire properly established, the most perfect instruments, and skilled operators who exercise their skill with proper care, a message, started at Chicago for New York, is as sure to reach its destination exactly in the words and figures in which it was started, as the lightning is sure to strike the object which attracts it. Intelligent and skillful operators all admit this. There is no reason, the atmosphere being right,

and all else right, why a message, correctly started, should not be correctly transmitted along the line to the end of the line, no matter how many hundred miles asunder may be the point of its departure and the point of its reception.

If this be so, then the efforts made by the courts to excuse those who undertake this business, should not be imitated or encouraged.

Again, it is said by enlightened courts, whose opinions we have quoted, that these forms furnished by the several companies, and they are all alike, when used by the sender of a message, and signed by him, becomes a contract between him and the company, by the terms of which he must abide.

The court told the jury, in so many words, this form signed by appellant was a contract between these parties by which their liability must be gauged. We have, in this opinion, said something on this point—that it was for the jury to determine whether it was, or not, a contract, knowingly executed by the party, with the intention to be bound by it.

We now desire to say, it is not a contract binding in law, for these reasons:  Our statute makes it the duty of telegraph companies to transmit all messages committed to them for purposes of transmission, in the order in which they are received. They are bound by law to serve all who apply. They are public institutions, established by public law, and to whom is granted the right of eminent domain. Persons who unlawfully injure or molest, or destroy any of their lines, posts, pins, etc., on conviction, are deemed guilty of a misdemeanor and liable to fine, or imprisonment in the penitentiary, or both. Failing to transmit a message, or suppressing a message, or making known its contents to any one other than the party to whom it is addressed, is deemed a misdemeanor, and punished by a fine not exceeding one thousand dollars.

By section 4 of the act, such companies have the power to purchase, receive and hold such real estate as may be necessary, etc., and may appoint such directors, officers and agents, and employ such servants, and make such prudential rules,

regulations and by-laws, as may be necessary in the transaction of the business, not inconsistent with the laws of this State or of the United States.   Laws of 1849, p. 188.   This act imposes upon these companies duties to perform to the public, which they must perform *nolens volens*.  For their performance they are entitled to a reasonable compensation, the tariff of which they adjust themselves under the power granted by the 4th section.   When this tariff is paid by the sender of a message, the duty of the company begins.   This payment is the consideration for the performance of its duty in each particular case.   On the assumption, then, that it is the duty of the company to transmit correctly the message for which they have received compensation, where, in law, arises any obligation on the part of the sender to repeat the message?

The fact is conceded that a telegraph company is the servant of the public, and bound to act whenever called upon, their charges being paid or tendered.   They are, in that respect, like common carriers, the law imposing upon them a duty which they are bound to discharge.   The extent of their liability is, to transmit correctly the message as delivered.   This is conceded.   But it is decided by all the courts that a common carrier can, by contract, restrict this liability.   The argument is, that the condition for repeating is such a restriction, and being in writing and signed by the sender, is, to all intents and purposes, binding upon him as a contract.

The question at once arises, where is the consideration for this contract?   It does not move from the company; on the contrary, they demand of the sender of the message fifty per cent in addition for repeating—for assuring the faithfulness of their own conduct.   We fail to perceive any consideration whatever on which to base this so-called contract.   It is not a contract of any legal or binding force.   This court said, in *Illinois Central Railroad Co.* v. *Morrison et al.* 19 Ill. 136, that a common carrier might restrict his common law liability by a contract fairly made with the shipper.   In that case, the contract was special and under seal, and for which the railroad

company paid a valuable consideration by reduction of the freight charges. That was a binding contract for value. The one in question is not so, and does not possess one of the essential elements of a valid and binding contract—namely, a consideration. It is a sham and a delusion, and an imposition upon the public who are compelled to resort to this agency in the transaction of their business.

If it be a contract, the sender entering into it was under a species of moral duress. His necessities compelled him to resort to the telegraph as the only means through which he could speedily transact the business in hand, and was compelled to submit to such conditions as the company, in their corporate greed, might impose, and sign such a paper as the company might present. "Prudential rules and regulations," such as the company is authorized by statute to establish, can not be understood to embrace such regulations as shall deprive a party of the use of their instrumentality, save by coming under most onerous and unjust conditions.

But it is said, a special agreement might have been made for insurance, in writing. To do this, the amount of risk must be specified on the contract, and paid at the time of sending the message; and as there is but one person in the world, a superintendent, authorized to make a contract of insurance, he must be hunted up and the terms negotiated—all which requires time—and a favorable opportunity to the sender be irretrievably lost. At Chicago, or other large cities, where a superintendent is supposed to be, there might not be much loss, but we are declaring the law for the whole State, and it is well known that at subordinate, though important stations, on telegraph lines, superintendents are not to be found; this provision is to such perfectly valueless.

As a party, repeating a message, and paying fifty per cent additional therefor, can not recover of the company to the extent of his loss, we are free to say such a contract, forced, as we have shown it is, upon the sender, is, in our opinion,

unjust, unconscionable, without consideration, and utterly void.

The remaining question is, as to the damages. As this case must be tried again, it is necessary some rule should be prescribed by which the damages are to be estimated. As a general principle, every person and corporation ought to make good all damages occasioned by his or their default. But it is not always easy, in cases of this kind, to state a general rule. It has been said, and very properly, that the great difficulty in such cases is, to distinguish between the right to recover and the amount to be recovered—the line dividing these two branches of the law sometimes vanishing entirely. The best reflection we have been able to bestow on this branch of the case, prompts us to say the rule adopted in *U. S. Telegraph Co.* v. *Wenger, supra,* in a similar case, is a reasonable rule.

The message, in that case, ordered a purchase of stock, which advanced in price between the time the message should have arrived and the time it was purchased under another order. The advance in price was held to be the measure of damages.

That message, as this, disclosed to the agent of the telegraph company the nature of the business to which it related —in this case, to sell a certain number of shares of stock.

If appellants were compelled to, and did, purchase nine hundred shares of this stock to replace the stock so sold by reason of the carelessness of this company, and that, in the interval between the selling one thousand shares and the repurchase by Wrenn of the nine hundred shares to replace the extra number of shares sold, that stock had advanced in price, this advance should be the measure of damages. It is reasonable to suppose this is what both parties had in view when the message was committed to the care of appellees.

In looking at these conditions prescribed by telegraph companies, this one in particular—but they do not differ, essentially, from those of other like companies—we are forcibly impressed with the belief that they are designed to relieve

themselves from all responsibility. Content to receive the money of the sender, they design to escape all responsibility. Such conditions are unreasonable, and ought not to receive the sanction of any court.

We have said, and we repeat, that there is no reason, apart from atmospheric causes, why a message should not be transmitted precisely as received. The art is reduced to a certainty. That courts should not be swift to exempt these companies from liability, is a dictate of public policy. To such perfection has the art reached, that, in the last thirty years in which electric telegraphs have been operated, we have been unable to find, among the reported cases in this country and in England, more than fifty instituted against those companies for losses occasioned by their negligence. The messages sent by them in this time, have amounted to millions. Under these circumstances, their bold claim to exemption should meet with no favor from the courts. The doctrine, to benefit the public, must be, as we have endeavored to establish, that a mistake in transmission is *prima facie* evidence of negligence, and the burden is on the company to show the contrary.

If these companies rely upon contracts as restricting their liability, it is incumbent on them to show a valid contract freely entered into by the sender of the message, and for a valuable consideration paid by the company or acknowledged by the sender. But even such contract will not relieve the company from gross negligence.

On the most mature reflection, aided by all the light shed upon this subject, we are at a loss to understand upon what principle telegraph companies should be accorded immunity for their torts, or be relieved from the liabilities voluntarily assumed by them. If they desire to restrict their liability, it must be done by a contract fairly and knowingly entered into, and for a valuable consideration.

Holding these views, the judgment of the court below must be reversed, and the cause remanded for further proceedings consistent with this opinion.        *Judgment reversed.*