THE CHICAGO, BURLINGTON & NORTHERN RAILROAD
COMPANY

V.

ADDISON H. HAWK.

*Railroads — Negligence — Personal Injuries — Evidence — Practice—*
*Holder of Stock Pass.*

1. Carriers may contract for exemption from responsibility for all negligence except that which is gross.

2. The plaintiff in a personal injury case must recover, if at all, upon the negligence charged in the declaration, and not upon something not charged and of which defendant has had no notice.

3. In the case presented, this court holds that the plaintiff's injury was occasioned by his own want of attention and care for his own safety, and that the judgment in his favor can not stand.

[Opinion filed December 16, 1891.]

APPEAL from the Circuit Court of Carroll County; the Hon. J. D. CRABTREE, Judge, presiding.

Mr. JAMES SHAW and SAMUEL RICHOLSON, for appellant.

Mr. GEORGE L. HOFFMAN, for appellee.

*Per Curiam.* This case was tried by this court at the December term, 1889, and the judgment of the court below was reversed, but the cause not remanded, as this court was of the opinion that there was no evidence in the record tending to sustain any of the charges of negligence on the part of the appellant, charged in the appellee's declaration, and also we were of the opinion that there was want of ordinary care on the part of the appellee, as disclosed by the evidence, and those facts being found by this court differently from those found by the court below, and the judgment being reversed for that reason, we ordered the finding of those facts to be incorporated and entered into the judgment of reversal, but by some mis-

prision of the former clerk of this court the judgment of reversal was entered by him without incorporating therein the finding of facts by this court as ordered. The appellee appealed to the Supreme Court and upon a hearing of the case by that court the judgment of this court was reversed and the cause remanded to this court because the record as it appeared there failed to show the necessary finding of facts as required by law, and directed this court in its judgment of reversal that "if it shall again enter a judgment of reversal based upon a finding of facts differently from that found by the trial court, that it recite in its final order the material ultimate facts as found by it from the evidence upon the issues submitted to and tried by the Circuit Court."

We have again considered the case and have arrived at the same conclusion that we heretofore did. The opinion filed by this court on the former hearing, written by Judge C. B. Smith, May 28, 1890, and reported 36 Ill. App. 327, expresses our views of the case fully, and the same will be and is hereby adopted by this court as the opinion herein as follows, to wit:

This is an action on the case, and comes here on appeal by appellant from a judgment of the Circuit Court of Carroll County. The material facts involved in this suit as disclosed by this record are these: Appellant owns and operates its road from St. Paul to Oregon in Ogle County, and from Oregon it runs its trains of cars over the Chicago and Iowa Railroad to Aurora. At Aurora, all its trains are stopped and broken up, and cars to go farther eastward and to Chicago are taken into custody by the Chicago, Burlington & Quincy Railroad Co. under some kind of a running arrangement with that road. The Burlington and Northern has nothing further to do with the cars or the stock after it is delivered to the C. B. & Q. road, and both cars and stock pass under the exclusive control of the C. B. & Q. road. But, notwithstanding this arrangement, appellant issues through shipping bills to Chicago, and gives its shippers, when in company with their stock, free passes, subject to certain regulations as to the amount of stock and the number of persons allowed to go with it under a free pass.

Appellee, Addison H. Hawk, lived at Chadwick, on the line of appellant's road, and was and had been for some time a dealer and shipper in stock over appellant's road, and was familiar with the methods, rules and mode of shipment on appellant's road.

On the 7th day of September, 1887, appellee shipped one carload of hogs from Chadwick to Chicago over appellant's road, and had them billed for Chicago in the usual and customary shipping contract of appellant's road. His own name was indorsed on the back of this contract as being entitled to pass free in accompanying his stock to Chicago.

Two other shippers, Mr. Bishop and Mr. Wakefield, also had stock for the same train, and they, in company with appellee, with their stock, started for Aurora and reached there some time after dark. As soon as the train reached Aurora, appellee, Mr. Bishop and Mr. Wakefield, left the caboose and train and went to a neighboring restaurant to get a lunch, and while they were at lunch, the train passed into the custody of the C. B. & Q. road and was at once broken up by the switch engines in the yard and the cars distributed to their proper places and for their proper destinations in the trains then being made up by the C. B. & Q. in its own yard. Appellee's stock was put in a train made up to go to Chicago that night, and was to and did leave Aurora about 9:30 P. M. The yards in Aurora are extensive and consist of a great many tracks, and are more or less covered with cars and trains being made up for different points, with several switch engines constantly at work shifting a great many cars from train to train.

After appellee and his companions had eaten their lunch, they went in search of the caboose and train upon which they were to continue their journey to Chicago. Not knowing where the caboose or train could be found, or where it would start from, they walked up among the tracks in the yard, where they observed a switch engine at work moving cars about from place to place, and among these cars which were being moved about by this engine was a caboose. Appellant swears they saw a man moving about in the yard with a lantern apparently taking the number of cars, and that they asked him

where the train of cars was, which was to take the C. B. & N. stock to Chicago, and that the man then pointed out "that caboose down there with the engine attached to it;" and that thereupon they went to this caboose, intending to get into it. Appellee then said to his companions, "We will go up to the caboose; there are too many engines switching around here, we will get hurt." Appellee and Wakefield got upon one end and Bishop on the other, but they found no light in the caboose, and the doors locked, and no person in charge of it except the engineer, who had hold of one end of it with his engine, switching it about with other cars, and bumping it against other cars in the manner usual to switching cars. Appellee and his companions made no inquiry of the engineer or fireman about the caboose when they found it dark and unoccupied, but kept their places in the ends of the caboose, while it was being thus hauled about by the engine. Appellee testifies that while so on the caboose, he was sitting on the guard rail with his face to the door of the coach, holding to the iron ladder and his feet hanging down, resting on the floor of the platform of the car. He was holding to the ladder as he says, to brace himself, not thinking of any accident, and talking. While in this position the moving cars came in contact with other cars, causing the car he was on to rebound, and that from such bump and rebound of the car he lost his balance, and that his feet was thrown backward over the end of the platform, and that one of his feet was caught between the shoulder of the drawbar and the wooden crane upon which the platform rests, and when the cars again came together, his great toe was so mashed that it had to be amputated that night. The injury was not regarded at that time as being very serious or liable to result in a permanent injury to appellee, but the wound refused to heal, and the injury resulted very disastrously to the health of appellee, and involved him in great suffering for a long time.

There are five counts in the declaration. They are not substantially different. The *gravamen* of the charge in all those counts is, that it was the duty of the defendant to have the caboose opened a sufficient length of time before the depart-

ure of the train for Chicago, so that appellee could board and
enter the said "last mentioned caboose" before the train
would start toward Chicago, and that the defendant was
guilty of negligence in not opening the doors of his caboose
upon which appellee was hurt, a sufficient length of time be-
fore the departure of the train, so that appellee might have
gone inside and taken a seat. No other negligence is charged
against the company, or relied upon on the trial.

The defendant pleaded not guilty, and upon a trial before the
jury, the appellee obtained a verdict of $6,000. Appellant
moved for a new trial, which the court overruled and gave
judgment to the plaintiff upon the verdict, to which appellant
excepted, and now brings the case here on appeal, assigns
numerous errors and asks for a reversal of the judgment.

In the view we take of this case it will not be necessary to
notice all the assignments of error relied upon for a reversal.

First, as to the negligence charged in the declaration. It
appears from the proof that the caboose upon which appellee
was hurt, was not the caboose upon which he was to be taken to
Chicago, but that on the contrary the caboose upon which he
was hurt belonged to a gravel train, which had just come into
the yards from the Fox River Branch of the C. B. & Q. road,
and was to be taken to its proper place in the yards as soon as
the tracks could be cleared for it to get out. Those in charge
of it had locked it up for the night and gone home. The
caboose which was to go to Chicago on the stock train was in
another part of the yard and upon another track some distance
away, and was in fact open a sufficient length of time
before the train departed to enable those who went on that
train to get in the caboose and be ready when the train started.
There was no negligence in the company in not opening the
caboose upon which appellee was injured, for that caboose was
not to be further used that night. Appellee had no right to
get in it; even if it had been opened and he could have entered
it he would not have gone to Chicago in it. It must be
borne in mind that there is no negligence charged in not open-
ing the caboose which was in fact intended to go to Chicago,
and which did go, and which was in fact open. But even if the

right caboose had not been open in time, it did appellee no harm, for he was not there, and was not for that reason prevented from getting in; nor was it because the right caboose was not open that he was hurt. There is therefore a total variance between the proof and the declaration, and an entire failure to prove the negligence alleged in the declaration, or any one count of it. Nor is it any answer to this objection to say that appellee was wrongfully directed to this car by some servant in the employ of the defendant, for there is no allegation of any negligence in that respect in the declaration. Appellee must recover if at all, upon the negligence charged in the declaration, and not upon something not charged, and of which defendant has had no notice.

Second. It is again insisted that inasmuch as appellee was riding upon a free pass under an agreement that the company should not be liable to him except for gross negligence, in case of injury, that he can not recover.

That portion of the contract upon which appellee shipped his stock and upon which he was riding, relating to the pass, is as follows:

"It is also agreed * * * that the persons who receive free transportation in charge of said stock, in consideration of the receipt of the same, agree to assume all risk of personal injuries from any cause whatever, except injuries arising from the gross carelessness of the railroad company."

(Signed)

" The Chicago, Burlington and Northern Railroad,

" A. H. Hawks, Shipper." By W. H. Oit, Agent."

Across the face of the above shipping contract was stamped in red letters the following sentence : " *Read this contract.*"

On the back of this shipping contract was the following statement, viz.:

" Parties actually in charge of and accompanying the within named stock, must write their own names here in ink.

(Signed) A. H. Hawk."

It will be seen from the above that the shipping bill and its provisions became to all intents and purposes a contract duly signed by both parties; and since there is no complaint by

appellee that he did not fully understand its terms and condi-
tions, or that it was not fairly, freely and intelligently entered
into, we assume that it was so fairly entered into and under-
stood by appellee when he signed it and bound himself to its
terms.    In consideration of the pass by which he saves him-
self the expense of his ride to Chicago he agrees to release
the company from all damages which may happen to him on
that trip except such as are caused by the gross negligence of
appellant.    That railroads and common carriers may now con-
tract for exemption from all negligence except that which is
gross has been so often decided by the Supreme Court of this
State, that that question must, so far as this court is concerned,
be regarded as settled law.    Arnold v. I. C. R. R. Co., 83 Ill.
280; I. C. R. R. Co. v. Reed, 37 Ill. 484; I. C. R. R. Co. v.
Morrison, 19 Ill. 136; Western Trans. Co. v. Newhall, 24 Ill.
466.    With the propriety or justice of this rule we can have
nothing to do.    It is our duty to follow and apply the law as
laid down by the highest judicial tribunal of the State.

Does the proof in this case show, then, that the defendant or
any of its servants were guilty of gross negligence?    We have
searched this record in vain for any such evidence.    What
are the plain uncontradicted facts in this cause furnished
by appellee himself, which were the immediate cause of
his injury?    Simply these: He and his companions chose
to go in this yard in the dark and hunt up the caboose for
themselves, and there casually find a man numbering cars
who informs them that the caboose pointed out is the one
to take the C. B. & N. stock to Chicago.    Upon approaching
the caboose they find it locked and dark, hitched to a switch
engine and being thrown about in the yard in the connection
with the other cars.    Without asking the engineer any ques-
tions as to what he was doing with this caboose, or where it was
to go, they got on it and stayed there, occupying a position
full of danger to themselves, without any knowledge on the
part of the engineer that appellee or any one else was there.
Wakefield and Bishop, who were riding with him, say there
was nothing unusual or out of the usual order in the switching,
and that there was no unusual bumping or jamming cars

together.   So far as the switching the cars about was concerned, there is no proof of any kind of negligence on the part of the engineer.   There is no proof of any duty or practice on the part of the company to send a guide with shippers to inform them where to find the train or caboose, and we know of no law which makes it the duty of a railroad company to keep a guard or watch over those who ride on any kind of a train, to prevent them from losing the train.   To impose such a rule on a railroad company, would be most unreasonable and impracticable; there is no hardship in requiring travelers to keep themselves informed as to the time and place of departure of trains.   This information can usually be had at the company's office.   In this case appellee sought no person nor any information at the office or depot, where he would be most likely to get correct information as to the location of the train he must take.   The person whom he met in the yard who informed him that he supposed the caboose then being switched around and pointed out to him was his caboose, gave him no direction or advice to get onto it while it was being thrown about and jammed against other cars, not open or lighted.   At the utmost, that man, whoever he was, or whatever may have been his duty, only made a mistake in pointing out the wrong caboose; he gave appellee no advice or encouragement to board that train while it was being switched about or to stand on the platform of the car until it was opened; his information was not the proximate cause of the accident.

Plaintiff himself swears that he voluntarily got on this car and stayed on there, knowing it was locked, thinking it was a safer place than on the ground among the tracks.   He thus himself acquits every one of any agency in inducing him to get onto that car before it was open, and assigns as a reason for his so doing that he regarded it a safer place than on the ground, where he supposed himself in danger of being run over, and where he had voluntarily gone without any agency on the part of defendant or any wrongful or negligent act on the part of any of defendant's servants.   After a most careful and attentive study of this record we are unable to find

where the defendant was guilty of any negligence, or lacking in the discharge of any duty it owed to appellee, much less of any gross negligence.

On the contrary the proof shows that appellee's injury was occasioned by his own want of attention and care for his own safety.

In addition to the facts and circumstances attending and leading to the injury, as disclosed by appellee himself, there is the testimony of three other witnesses testifying to the admission of appellee, made at the time or on the same night of the injury, as to how it happened, in response to questions asked him by those who were taking care of him and assisting him after he was hurt, and at a time when he himself thought his injuries were not of a very serious or permanent character.

John Kerns swears that he was a watchman at a street crossing within three or four rods of where Mr. Hawk was hurt, and that he went to him in three or four minutes and asked him how it happened, and that appellee replied, "It was my own foolishness or carelessness. I put my foot back and got it ketched in the draft iron."

W. J. Amy, the nurse at the hospital where Mr. Hawk was taken after the injury, testified to having a conversation with him on his arrival at the hospital. "I said, 'this is too bad; how did it happen?' 'Well,' he says, 'my own carelessness. I was talking with the gentlemen and got my foot caught.' He said he was leaning back against the railing and got his foot caught in the bumpers. This was before his toe was amputated."

Dr. C. L. Smith, the attending surgeon, who amputated appellee's toe and dressed the wound, swears that, in his conversation with appellee on that occasion, appellee said (as near as witness could remember), "something to the effect that he was standing on the platform with his foot hanging over the end of the car and in some way got caught by the bumpers."

Appellee was recalled to testify in response to these alleged admissions made by him to these three witnesses. He says: "I had no conversation that I know of with Mr. Kerns at all; have no recollection of stating that I put my foot back fool-

ishly; I have no recollection of making such statement to him or the yard master. As to the conversation that Dr. Smith swore to, I have no recollection of it now. I would not swear that it was not true; he helped me down stairs next morning, and we had a conversation, but what it was I don't know. Mr. Amy was there when Dr. Smith was there; did not say to him that I had my foot hanging over the end of the car. My best recollection is, it is not true; his statement was not true; but I would not swear it was not."

Giving to appellee's denials all the force that can be fairly claimed for them it amounts only to a statement that he does not remember of making the admissions and does not believe he made them, but that he will not swear he did not make them. This kind of negative testimony from a single interested witness, can not fairly be held sufficient to overcome the positive declarations of three apparently fair, intelligent and wholly disinterested witnesses, swearing that appellee did make the statements charged to him.

After a careful and attentive study of this record we are unable to find where the defendant was guilty of any negligence, and much less of any gross negligence; but on the contrary, the proof shows clearly that appellee's injury was occasioned by his own want of that reasonable degree of care which the law requires every man to exercise for his own safety.

For the reason that this record fails to show any cause of action against the defendant, the judgment will be reversed, but not remanded.

*Judgment reversed.*

Finding of facts to be incorporated into final order of reversal, herein, to wit:

"And it appearing to this court that the facts are different from those found by the Circuit Court, and the judgment herein being reversed on account of such different finding of facts, in consideration of the premises and in accordance with the statute in such case provided, we do find the facts in said cause submitted to this court and found by us from the evidence upon the issues submitted to and tried by the Circuit Court as follows, to wit:

"The appellee's injury was caused by his own want of reasonable care for his own safety at the time of, and preceding the injury, and also that there is and was no evidence in the record or before the jury in the court below proving or tending to prove any of the acts of negligence on the part of appellant in manner and form as alleged, as charged in any of the counts in the said declaration."